**STATE of Tennessee, Appellee,**

v.

**James MOORE and James Carter, Appellants.**

Court of Criminal Appeals of Tennessee, at Jackson.

Dec. 31, 1985.

Opinion on Petition to Rehear
Jan. 31, 1986.

Moore's Pro Se Application for Permission to Appeal Denied by Supreme Court
April 28, 1986.

Permission to Appeal Denied as to Carter
April 28, 1986.

Application for Permission to Appeal Denied by Supreme Court as to Carter
June 2, 1986.

Patrick F. Martin, Lafon, Hardee, Farmer & Martin, Jackson, for Moore.

David Hardee, Michael T. Tabor, Jackson, for Carter.

W.J. Michael Cody, Atty. Gen., James W. Thompson, Asst. Atty. Gen., Nashville, James G. Woodall, Dist. Atty. Gen., R.C. Stegall, Roger Moore, Leigh Grinalds, Asst. Dist. Attys. Gen., Jackson, for appellee.

## OPINION

TATUM, Judge.

The defendants, James Moore and James Carter, appeal their convictions for bank robbery with the use of a firearm, T.C.A. §§ 39–2–502, 39–6–1710. Moore was sentenced to 40 years imprisonment for bank robbery and 5 years for the use of a firearm in the commission of a felony. Carter was sentenced to 30 years imprisonment for bank robbery and 5 years for the use of a firearm in the commission of a felony. Both defendants were given consecutive sentences. The defendants filed separate briefs raising several issues. We have concluded that the judgments as to both defendants must be affirmed.

Both Moore and Carter assigned issues attacking the sufficiency of the evidence.

The evidence adduced at trial showed that on September 8, 1983, at approximately 1:15 p.m., two black males entered the Old Hickory Mall Branch of the Jackson National Bank and declared "This is a robbery. Stick it up. Don't anybody move." Both of the men were wearing military fatigue-type clothing, gloves and blue and red ski masks, and one was carrying a .38 black snub-nosed pistol. Both men appeared as if their clothes (jumpsuits) were "padded." As one gunman threatened to kill a bank employee, the other robber jumped across the teller's counter carrying a big white sack similar to a pillowcase. He forced a bank teller to empty the contents of two cash drawers into the sack. The two masked robbers then fled the bank in what appeared to bank employees to be a 1970 burgundy (maroon) and white Pontiac driven by a third individual. The car had no license plate and the black male driver was unmasked. The robbers managed to take a total of $14,806.43 in cash, including 50 twenty-dollar bills previously recorded by the bank as "bait money."[1] None of the bank employees could identify the two robbers because of the ski masks which covered the robbers' faces.

Three other witnesses testified that they observed two black males wearing masks and stuffed or padded coveralls enter the mall. They also observed a large maroon car with a white top parked in a No-Parking zone directly outside the bank. The car had no license plate. Two of the witnesses identified the defendant Moore as the man who was driving the getaway car. Following the robbery, the getaway car was seen leaving the mall parking lot and traveling west on Old Hickory Boulevard, subsequently stopping at the Foxfire Apartments complex.

Investigators with the Jackson Police Department discovered a 1978 Pontiac Bonneville, maroon with a white top, parked near the back of the Foxfire Apartments complex. The car was identified by several witnesses as being the getaway car used by the two robbers. A green fatigue jacket and a glove were found in a dumpster located near the abandoned car.

Other evidence established that the getaway car was purchased from Frazier's Used Cars in Jackson on September 1, 1983. The salesman at the used car lot identified the defendant Moore in a photographic line-up conducted a few days after the robbery and at trial as being the individual who bought the car. He also identified defendant Carter as having been present at the car lot on the date the car was purchased. The owner of Frazier's Used Cars also identified defendant Moore as having been involved in the purchase of the car and stated that another man, possibly defendant Carter, supplied the cash to pay for the car. He also identified a drive-out tag that was found on the maroon and white Pontiac as one that he had filled out for the sale of the car.

A fingerprint specialist with the Jackson Police Department testified that he examined the automobile used in the robbery for

---

1. The branch manager of the bank explained that bait money consists of pieces of U.S. currency whose serial numbers are recorded for purposes of identification. When bait money is removed from a teller's cash drawer, a silent security alarm and two security cameras are activated.

possible identifying fingerprints. He concluded that two identifiable fingerprints taken from the side of the getaway car matched a set of fingerprints previously taken from defendant Moore. In addition, five latent fingerprints found on the drive-out tag were determined to be those belonging to defendant Moore.

A desk clerk at the Airways Motor Hotel in Jackson testified that on September 10, 1983, he received four twenty-dollar bills from the defendant Carter in payment for a rented room. The serial number on one of these bills matched the number listed by the Bank as part of the bait money taken by the robbers. Another witness also testified that sometime after the robbery, he received three twenty-dollar bills while involved in a crap game with the defendant Carter. These three bills were also identified as having been part of the bait money taken.

A teller with another local bank testified that on September 16, 1983, she received $400 worth of twenty-dollar bills from a lady customer who requested the teller to exchange the twenties for different denominations. Four of the twenty-dollar bills proved to be part of the stolen bait money. It was established that the lady and defendant Carter were related and part-owners in a family restaurant business.

Robert Powell, a State witness, testified that he participated in the robbery of the Jackson National Bank, Mall Branch, along with Robert Bailey and defendants Moore and Carter. Powell had previously pled guilty to armed bank robbery for his involvement in this offense. He related that on September 7, 1983, defendant Carter went into the bank and made a withdrawal. This was in preparation of the robbery which the four men had planned.[2] On the morning of the robbery, September 8, 1983, Robert Bailey and defendant Carter arrived at Powell's house with ski masks, jumpsuits, gloves and a .38 snub-nosed pistol. The three men left Powell's house and went to meet defendant Moore. Around noon, they all agreed to meet at the Foxfire Apartments no later than 1:00 p.m.

Powell further testified that he and defendant Moore wiped down the car purchased for use in the robbery, so as to leave no fingerprints on it. They then met Robert Bailey at the Foxfire Apartments and he (Powell) and Bailey put on the jumpsuits, which they stuffed with pillows. Defendant Carter was parked nearby in another car, as part of the getaway plan. Defendant Moore then drove the getaway car to the Bank where Powell and Bailey got out. The two men pulled their ski masks down over their faces and entered the Bank. The robbery then took place within a matter of two minutes. The two robbers fled the bank and got back into the maroon and white getaway car. Defendant Moore then drove back to the Foxfire Apartments where Powell removed his fatigue shirt and gloves and threw them in a dumpster. Powell and defendant Moore then climbed into the trunk of the other car in which defendant Carter was waiting. Bailey got on the back floorboard and defendant Carter drove away, leaving the maroon and white car at the Foxfire Apartments. The four men drove to defendant Carter's sister's house where the stolen bank money was divided. Each man got $3,500 and each paid defendant Carter $75 for the cost of the car purchased by him for use in the robbery.

Both defendants presented an alibi defense. The defendant Moore's theory was that they had purchased the maroon and white Pontiac for someone else.

■ The evidence is sufficient for a rational trier of fact to be convinced beyond a reasonable doubt of the guilt of both defendants as to both offenses. The testimony of the accomplice, Robert Powell, is substantially corroborated as can be seen from our summary of the evidence. The evidence meets the requirements of Rule 13(e), T.R.A.P. Therefore, the issues at-

---

2. The head teller of the bank testified that on September 7, 1983, the defendant Carter made a $200 savings withdrawal from the Mall Branch.

She stated that the defendant Carter leaned "way over the counter and looked around," making her feel very uncomfortable.

tacking the sufficiency of the evidence are overruled.

■ We note here that defendant Moore's Motion for a New Trial was untimely filed. The verdict of the jury was returned on October 18, 1984. Moore's order of sentence was entered on November 14, 1984. Moore's Motion for a New Trial was not filed until January 18, 1985. Tennessee Rules of Criminal Procedure, Rule 33(b) provides that a written motion for a new trial shall be filed within thirty days of the date the order of sentence is entered.[3] Thus, the Motion for a New Trial was not timely filed within thirty days from the verdict or the order of sentencing. The untimely filing of a motion for a new trial waives the appellant's right to present issues on appeal that are required to be included in the motion for a new trial. *State v. Givhan*, 616 S.W.2d 612 (Tenn. Crim.App.1981). We have however reviewed the record for error which has affected the substantial rights of Moore as authorized by Rule 52(b), T.R.Cr.P. and for error which we are authorized to notice pursuant to Rule 13(b), T.R.A.P. In doing so, we find that all of the issues presented by Moore are without merit and that he is not prejudiced by the failure to file his Motion for a New Trial within the time allowed. Moore's principal issues were also presented by Carter. We will discuss Carter's issues.

The next issue is that the entry of a *nolle prosequi* to a previous indictment charging the defendant with being an accessory before the fact of bank robbery and concealing stolen property collaterally estopped the State from offering any evidence known to the State at the time of the *Nolle prosequi*. The minute entry on the *nolle prosequi* stated as follows:

"Upon due consideration of the Court, upon statements made by R. Leigh Grinalds, Assistant District Attorney, concerning the facts of the case, and it appearing that no offense of the Court has been committed, it is hereby ordered, adjudged and decreed that the charge of accessory before the fact of bank robbery and concealing stolen property should be nollied at this time."

In support of their contention, the defendants cite *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The facts in *Ashe v. Swenson* were not analogous to the case at bar. In *Ashe*, the defendant was tried and acquitted of robbing one of six poker players. Six weeks later, the defendant was brought to trial again for the robbery of another poker player. The United States Supreme Court held that the rule of collateral estoppel is a part of the Fifth Amendment's guarantee against double jeopardy. The Court said:

" 'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an *issue of ultimate fact has once been determined by a valid and final judgment,* that issue cannot again be litigated between the same parties in any future lawsuit. Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in *United States v. Oppenheimer*, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161." (Emphasis supplied)

\* \* \* \* \* \*

"... Where a previous *judgment of acquittal was based upon a general verdict*, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' " (Emphasis supplied)

■ A *nolle prosequi* is not a bar to a subsequent prosecution unless it is entered after the defendant has been put in jeopardy. *State ex rel. Hobbs v. Murrell*, 170

---

3. T.C.A. § 40–35–401 purports to supercede Tennessee Rules of Criminal Procedure, Rule 33(b).

Tenn. 152, 93 S.W.2d 628 (1936). To *nolle prosequi* one indictment and prefer a new one to the grand jury produced on the same facts, is not error. *Zachary v. State*, 66 Tenn. 1 (1872).

■ The defendants were not placed in jeopardy before the *nolle prosequi* was entered. Jeopardy does not attach in a jury case until the jury is impaneled and sworn. In a non-jury case, jeopardy does not attach until the first witness is sworn. *State v. Todd*, 654 S.W.2d 379 (Tenn.1983). The record does not establish either the impaneling and swearing of a jury or the swearing of a witness prior to the entry of the *nolle prosequi*. The defendants were not placed in jeopardy before the entry of the *nolle prosequi*. No "issue of ultimate fact" was determined by a valid and final judgment. There was no relitigation of any issue. The entry of the *nolle prosequi* was not a judgment "based upon a general verdict." The Doctrine of Collateral Estoppel is not applicable in the case at bar.

■ In the next issue, defendant Carter states that he was denied a speedy trial. He alleges that the indictment charging him with accessory before the fact and concealing stolen property was returned in November, 1983. Counsel read a portion of the first indictment at trial, however a complete copy of it was not made a part of the record. The court and counsel recognized that a *nolle prosequi* was entered on the first indictment but the date of dismissal is not shown by the record. The record reveals that the indictment in this case was returned on February 24, 1984 and that the trial began on October 15, 1984. Actual restraints imposed by an arrest and holding to answer a criminal charge is required to invoke the speedy trial provisions of Article I, Section 9, Constitution of Tennessee and the Sixth Amendment to the United States Constitution, requiring a speedy trial. *State v. Northcutt*, 568 S.W.2d 636 (Tenn. Crim.App.1978). Thus, the actual delay was from February 24, 1984, the date of the indictment in this case, until October 15, 1984—a period of less than eight months.

■ In considering whether a defendant's right to a speedy trial has been violated, four factors are to be weighed: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and, (4) the prejudice to the defendant. *State v. Bishop*, 493 S.W.2d 81 (Tenn. 1973).

■ First, the length of the delay is less than eight months. The case was continued only one time and for good cause.

Next, the defendant objected to the continuance. The reason for the continuance was that a witness for his codefendant, Moore, was not present and a crucial witness for the State was not present. Also, the mother of one of the jurors was ill and if the case had not been continued, the court would have been required to proceed in a trial of several days without an alternate juror, since the panel was exhausted. Furthermore, the holiday of July 4th was approaching and would have occurred during the trial. The reasons for the delay were not caused by the State and there was no hint of bad faith on the part of the State to prejudice Carter.

Finally, Carter fails to show how he was prejudiced. He asserts that during the third day of trial, October 17, 1984, he suddenly remembered that on the day of the bank robbery, he had taken a taxicab from his mother's home to Carlene Spear's service station and that the taxicab company's records were destroyed after one year. No explanation is given as to why the taxi ride was not earlier remembered by Carter and related to his attorney. Also, there is no assurance that Carter would have remembered this incident earlier had the trial been held earlier.

Upon considering the four factors, we conclude that the defendant's constitutional rights to a speedy trial have not been violated. This issue is overruled.

■ In the next issue, Carter says that the trial court erred in not granting his Motion for Severance so as to allow him to be tried separately from the defendant,

Moore. Carter (and also Moore) has fallen far short of the requirement of Rule 27(a)(7), T.R.A.P., that appropriate reference be made to the portion of the record relied upon. The brief makes no reference and gives us no clue as to where we might find an order denying a severance. Carter's failure to comply with Rule 10(b), of the Rules of the Court of Criminal Appeals and with Rule 27(a)(7), T.R.A.P., has caused this issue to be waived.

Further, the record does not reveal that the motion for a severance was presented to the trial judge. In *State v. Kinner,* 701 S.W.2d 224 (Tenn.Crim.App.1985), this court said:

> "Moreover, there is nothing in the record to indicate that the motion was ever brought to the attention of the trial court. It must affirmatively be shown that a question sought to be reviewed by an appellate court was presented to, and passed on, by the trial court. The filing of a motion with the clerk without presenting it to the trial court for determination is of no effect. A trial judge will not be placed in error for failing to consider something which was never presented to him."

The next issue is that the trial judge erred by refusing requests to give the "Telfaire charge" to the jury. See *United States v. Telfaire,* 469 F.2d 552 (D.C.Cir.1972). Tennessee does not require the "Telfaire Charge." *State v. Lewis,* 628 S.W.2d 750 (Tenn.Crim.App.1981); *Holt v. State,* 591 S.W.2d 785 (Tenn.Crim.App. 1979). This issue is overruled.

Defendant Carter next states that the in-court identification of him by the witnesses Frazier and Gullet was impermissibly suggestive and inadmissible in evidence under *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Mr. Frazier was the owner of the car lot where the getaway car was purchased and Mr. Gullet was an employee.

When Mr. Gullet was initially shown a group of photographs, he identified Moore but did not identify Carter. Mr. Gullet explained at the suppression hearing that he did not identify Carter because he was only asked by the police who purchased the car. These facts were brought out at trial, giving the jury the opportunity to weigh the identification evidence by Mr. Gullet. Mr. Gullet was personally acquainted with both Carter and Moore before they appeared at the car lot to purchase the car. Thus, it is unlikely that his in-court identification is unreliable.

Mr. Frazier did not purport to make a reliable identification of Carter. He testified that "he believed" that Carter was present when the getaway vehicle was purchased but that he was not certain of his identification of Carter. Hence, the photographs did not influence a positive identification of Carter by Frazier; Frazier made no positive identification. This issue is without merit.

The judgment of the trial court is affirmed as to both defendants.

WALKER, P.J., and BYERS, J., concur.

### ON PETITION TO REHEAR

TATUM, Judge.

The appellant, James Carter, has filed a petition to rehear, requesting this court to suspend the requirements of Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure, and Rule 10(b) of the Rules of the Court of Criminal Appeals and to consider on its merits the issue of whether the trial court erred in not granting his Motion for Severance so as to allow him to be tried separately from the defendant James Moore. We held that this issue had been waived due to Carter's failure to make appropriate reference to the portion of the record relied upon (as required by Rule 27(a)(7), T.R.A.P.), as to where in the record an order denying a severance was made. In the Petition for Rehearing, defense counsel has cited the portion of the voluminous record dealing with the trial court's oral denial of the appellant's Motion for Severance. No written order was entered on the pre-trial motion but we elect to

grant the petition, limited to a reconsideration of the above-stated issue.

The appellant argues that the joint trial with defendant Moore violated *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The appellant says that a statement made by defendant Moore to police implicated him as being with Moore at the car lot when the getaway vehicle was purchased. The testimony of the police officer as to Moore's oral statement is as follows:

"Well, he was quick to tell us that he had been in the park up by Lincoln Courts and that somebody had approached him up there and asked him if he knew where that he could buy a cheap automobile and stated that he did know, and then he said either later that day or a day or so following that that somebody came by and picked him up and told him he had the money and wanted him to show him where to get the car. He said that he went to—rode with this fellow to a—either a maroon Oldsmobile or Cadillac and got in that and rode out to Frazier's Used car Lot where a deal was made on a '73 maroon and white Pontiac, but he said that the deal couldn't be closed because they didn't have a $300.00 car; that they only had a $400.00 car, but finally reached an agreement to buy one for the sum of $350.00, and that after the car was bought that he merely drove it out on Hollywood Drive and parked it and put an 'out of gas' sign on it and left it, and that's the last time he saw the car."

 In his brief, the defendant argues that there was other evidence in the record that he owned a maroon Oldsmobile and that the jury could relate this fact to Moore's statement that he rode with the other "fellow" to the used car lot in a maroon Oldsmobile or in "a maroon Oldsmobile or a Cadillac." We still do not have a reference as to where in the record this evidence may be found. However, as summarized in the main opinion, there is positive and clear testimony from other sources that Carter was at the used car lot with Moore. Other evidence of Carter's guilt is overwhelming. Therefore, any *Bruton* violation was harmless beyond a reasonable doubt. See *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). We overrule this issue.

We adhere to our original judgment affirming the appellant's convictions.