IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

AUGUST 1997 SESSION

FILED

April 23, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

RICKY HARRIS,                    *        C.C.A. # 03C01-9611-CR-00410

        Appellant,             *        CARTER COUNTY

VS.                              *        Hon. R. Jerry Beck, Judge

STATE OF TENNESSEE,              *        (Post-Conviction)

        Appellee.              *

For Appellant:

Laura Rule Hendricks
606 W. Main Street
Suite 350
P.O. Box 84
Knoxville, TN  37901-0084
(on appeal only)

Margo Lamb
Jack Carpenter
Main Street Courthouse
Elizabethton, TN  37643
(at post-conviction hearing)

For Appellee:

John Knox Walkup
Attorney General & Reporter

Timothy F. Behan
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN  37243-0493

Ken Baldwin
Assistant District Attorney General
900 East Elk Avenue
Elizabethton, TN  37643

OPINION FILED:_____

AFFIRMED

GARY R. WADE, JUDGE

**OPINION**

The petitioner, Ricky Harris, was convicted of first degree murder and received a life sentence. This court affirmed the conviction and the supreme court denied review. State v. Ricky Jerome Harris, No. 85 (Tenn. Crim. App., at Knoxville, Nov. 8, 1990), app. denied, (Tenn., Feb. 4, 1991). In 1992, the petitioner filed this petition for post-conviction relief. In 1996, after several evidentiary hearings, the trial court denied relief.

In this appeal of right, the petitioner presents the following issues for review:

> (I) whether the post-conviction court erred by ruling that any failure on the part of the state to provide exculpatory evidence to the petitioner in advance of trial did not warrant setting aside the conviction; and

> (II) whether the post-conviction court erred by finding that the petitioner received the effective assistance of counsel.

After a careful review of all of the evidence, we affirm the judgment of the trial court.

A summary of the convicting evidence, as taken from our opinion on direct appeal, is helpful. At about 7:50 A.M. on September 8, 1987, the petitioner's former wife, Laverne Gouge Harris, and her young daughter, Laura Harris, left the residence they shared with the victim, Dolly Gouge. The victim's mother, Vena Odom, lived in an apartment beside Ms. Gouge. Between 8:00 and 8:30 A.M., the victim's sister, Helen Hopson, telephoned three times to check on their mother. When there was no answer, Ms. Hopson and her husband drove to the residence. Ms. Gouge was not present. Ms. Hopson smelled an odor which she described as reminding her of a hospital.

At approximately 9:45 A.M., Ms. Hopson notified Ms. Harris that the

2

victim was missing.  Ms. Harris drove to the residence and also noticed a "hospital" odor near the door.  The petitioner arrived shortly thereafter.

Police officers, who were called to the scene, found the victim's glasses near the edge of the porch and her lower denture in the trampled flower bed.  A hair roller and a blue woman's shoe were also found.  When questioned, the petitioner told officers that he had been to the Gouge residence at 8:00 A.M. to get some personal belongings.  When she did not answer the door, he left.  He claimed that he drove away, thought about returning again, but then drove away without seeing the victim.

Three and one-half months later, parts of a skeleton were found near a cemetery in the adjoining Washington County.  A robe was found matching that worn by the victim on the date of her disappearance.  The upper denture and hair rollers like those worn by the victim were at the scene.  A blue shoe matching that found in the flower bed was also recovered.  The body had apparently been dismembered by animals.  Neither the time of death nor the cause of death could be determined.

A witness testified that the petitioner had been in a parked car watching the victim's house through binoculars sometime between 7:30 and 7:55 A.M. on the day of her disappearance.  Between 8:15 and 9:00 A.M., a next-door neighbor, Joyce Hinkle, saw a light-colored automobile with Sherwood Chevrolet stickers on the window parked in front of the victim's residence.  Ms. Hinkle heard the victim exclaim with surprise and, soon thereafter, she saw the petitioner walking quickly while clutching something in his hands.  "He went around to the front entrance of the victim's home, then came back around and seconds later he went

3

back around the house completely out of her sight." Harris, slip op. at 6. She described the petitioner as wearing gloves and holding a bottle.

As the petitioner made a second trip around the victim's house, Ms. Hinkle passed by and they spoke. She saw the petitioner drive away in the direction of Elizabethton, but minutes later saw the same car traveling on a different route toward Roan Mountain. When the petitioner returned to the victim's driveway, he was not wearing gloves and had changed clothes. He explained to Ms. Hinkle that he was getting some albums from the residence.

Officer William Foster also observed the petitioner on the day of the victim's disappearance. He recalled that the petitioner went to his motel room and then to his place of employment at Sherwood Chevrolet, before driving to his attorney's office and then to a car wash.

Employees at Sherwood Chevrolet recalled that on the date of the victim's disappearance, the petitioner did not arrive at work on time. One witness described the petitioner as flushed, excited, and sweating when he did arrive. Another employee noticed very deep scratches on his forearms.

Charles Carr, who lived near where the body was found, recalled seeing a new gray car with dealer's tags near his residence around 9:00 A.M. on the date of the victim's disappearance. He had seen the car twice previously in the months prior to the incident.

James Hodge also lived near the cemetery where the body was discovered. He saw a gray car traveling the area between 8:30 and 9:00 A.M. on

4

the date the victim disappeared. About ten minutes later, he saw the same car again. He described it as a new gray Chevrolet with red pinstripes, dealer's tags, and new car stickers. He identified the petitioner as the driver. See Harris, slip op. at 2-14.

I

The petitioner initially contends that the state failed to disclose material, exculpatory information in violation of Brady v. Maryland, 373 U.S. 83 (1963). He alleges five separate Brady violations:

> (a) suppression of evidence that three eyewitnesses had seen the victim alive at a time after the prosecution believed she had been murdered;
>
> (b) suppression of evidence that there was a question as to whether the body found in the cemetery was the victim's;
>
> (c) suppression of evidence that a witness could refute Foster's testimony that the petitioner vacuumed the trunk of his car the day the victim disappeared;
>
> (d) suppression of evidence that Foster was a convicted felon; and
>
> (e) suppression of evidence that someone else had confessed to murdering the victim.

In the landmark case of Brady v. Maryland, the United States Supreme Court ruled that the prosecutor has a duty to furnish exculpatory evidence to the defendant. Exculpatory evidence may pertain to the guilt or innocence of the accused and/or the punishment which may be imposed if the accused is convicted of the crime. State v. Marshall, 845 S.W.2d 228 (Tenn. Crim. App. 1992).

Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to

5

guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. This duty to disclose extends to all favorable information irrespective of whether the evidence is admissible. Branch v. State, 469 S.W.2d 533 (Tenn. Crim. App. 1969). And, while Brady does not require the state to investigate for the defendant, it does burden the prosecution with the responsibility of disclosing statements of witnesses favorable to the defense. State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984). The duty does not extend to information that the defense already possesses or is able to obtain or to information not in the possession or control of the prosecution. Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977).

Before this court may find a due process violation under Brady, the following elements must be established:

> (1) the defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> (2) the State must have suppressed the information;
>
> (3) the information must have been favorable to the accused; and
>
> (4) the information must have been material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995) (as amended on rehearing).

In Edgin, our supreme court adopted the following standard for materiality:

> [T]here is constitutional error "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ...
>
> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant

6

> would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Edgin, 902 S.W.2d at 390 (quoting Kyles v. Whitley, 115 S. Ct. 1555, 1566 (1995)).


(a)

The petitioner's first Brady claim concerns a possible identification of the victim at the bank hours after the state alleged the petitioner had killed her. The petitioner testified that when he filed a request under the Freedom of Information Act, he received two slips of paper indicating the victim may have been seen about noon on September 8, 1987, at the Citizen's Bank.

Donna Vaughn testified at the evidentiary hearing that on September 8, 1987, she was with her mother, Mary McQueen, and her aunt, Brenda Crowe, at the drive-through window of Citizen's Bank on Broad Street, at 11:00 or 11:30 A.M., when she saw a small, elderly lady sitting on the passenger's side in another car. "She was kind of trying to get our attention like something was wrong or she wasn't right, one of the other." The woman had short, dark brown hair that was "rolled real neat." There were no rollers in her hair and she was not slouchy in appearance. Although Ms. Vaughn could see the woman only from her shoulder up, she determined the woman was a small lady around seventy years of age. Ms. Vaughn observed the woman for five to ten minutes and described her as "just moving around like she was trying to get our attention and rolling her eyes."

Ms. Vaughn "constantly" watched the older woman and asserted that she acted in a strange manner. Ms. Vaughn described her as petite or "slim faced."

7

The woman was not wearing a robe. Her hair was lighter than what she saw in photographs of the victim. Further, the woman at the bank appeared smaller than the photographs of the victim indicated. After finishing business at the bank, Ms. Vaughn had lunch with her relatives and then returned home at approximately 12:00 noon. When they turned on the television set, she saw a picture of a woman who had been described as missing. Ms. Vaughn immediately believed her to be the woman she had seen at the bank. She recalled that "we all looked at each other and said -- that looks like the lady that we had saw." Ms. Vaughn remembered that her mother or aunt called the sheriff's department, but no one contacted her about the matter.

Mary McQueen, who was present at the bank with her daughter, testified that a bank book, which was entered into evidence, confirmed that a deposit was made on September 8, 1987. Ms. McQueen recalled seeing a woman with dark, short, curly hair sitting in the passenger seat of another vehicle. While she did not remember if the woman wore glasses, she remembered that she was a very neat person and had a medium rather than petite build. If the woman wore dentures, they would have been in her mouth. She did not have rollers in her hair and Ms. McQueen did not recall if the woman wore a robe.

Ms. McQueen stated that when the vehicle moved forward in the drive-through lane, the woman passenger turned around and tried to get her attention. She recalled thinking "the little lady wasn't right" and acknowledged it was possible this incident at the bank could have occurred at a time different than the date of the victim's disappearance.

Ms. McQueen confirmed that when she returned home and turned on

8

the television set, she saw a woman on television who appeared to be the same person as the one at the bank. Ms. McQueen stated, "If it wasn't her, she [had] a twin."

Brenda Crowe, Ms. Vaughn's aunt, confirmed the incident. She also described the woman as having short, curly hair with a very neat appearance and no rollers in her hair. Ms. Crowe did not remember if the woman wore glasses but did recall that she may have worn a cardigan sweater. She remembered the woman to be small or petite with hair a lighter color than that of the victim.

Former Supreme Court Justice Penny White, who was defense counsel at trial, testified that the district attorney did not have an open file policy at that time. She recalled filing a Rule 16 motion for discovery which included a request for any exculpatory information. She stated that even after discovery was ordered, the district attorney refused to allow her personal access to any of the records. Attorney White viewed the evidence of the three woman as clearly exculpatory: "If the jury believed the witnesses, then Harris could not have done the killing." She confirmed she did not receive any information in advance of trial indicating anyone had seen the victim.

James Bowman, co-counsel for the defendant, testified that even if the women did not see the victim on the date of her disappearance, he would have still used their testimony.

Laverne Gouge, the victim's daughter, lived with her mother on the day of the disappearance. She testified that her mother owned only one pair of glasses, was five feet six or six and one-half inches tall, and weighed one-hundred fifty to

9

one-hundred sixty pounds. Ms. Gouge recalled that the police arrived the day of the disappearance around 11:00 A.M. No television cameras were present. She did not give the media a photo of her mother, although at some point, she did give the police a photograph.

Officer Shannon Morton testified that when he arrived at the victim's house at about 11:30 A.M., other officers were there. He did not arrange a news broadcast for the noon day news on September 8. "This was done late in the afternoon on the day of the 8th and ... the first ... news reports were broadcast on the 11:00 o'clock news." Officer Morton did not know of any press releases prior to the noon hour on September 8. He claimed that even if he had a photograph of the victim at 11:30 A.M., it would have been impossible to have it ready for a noon hour television broadcast.

Officer Morton testified that medical records showed the victim weighed one-hundred forty-four pounds and was five feet six inches tall. The victim's sister described her as five-feet four inches, weighing one-hundred forty pounds. He remembered that at the preliminary hearing, the victim's daughter stated that her mother had more than one pair of glasses and admitted she was uncertain whether her mother was wearing rollers in her hair on the morning of her disappearance. Officer Morton remembered the incident at the bank was the only reported possible sighting of the victim.

David Crockett, the District Attorney, testified that the report of the incident at the bank was "dearly a case of mistaken identity." He claimed it was an "obviously inaccurate piece of evidence that had no bearing on the case."

10

William Crumley, Sheriff of Carter County on the date the victim was reported missing, testified that news releases were his responsibility. He claimed that he did not authorize any news releases prior to noon. Moreover, he asserted "it would have been virtually impossible because from the time of the original call to noon was a relatively short period of time." He did not recall any media being present and withheld his decision to contact news media until late that afternoon. He remembered that the first broadcast that the victim was missing was on the 11:00 P.M. news.

The trial court made the following findings of fact and law:

The information, if it could withstand investigation and critical evaluation, would have been exculpatory. ...
The information received by the Sheriff's Department was not turned over to the District Attorney and, as a result, the information was not turned over to defense counsel.

***

Under applicable Brady/Kyles standards, the state's theory that the petitioner is not entitled to a new trial seems compelling.

Physical Evidence

The victim, Dolly Gouge, could only be considered a large woman. The testimony of the witnesses at the bank on September 8, 1987, indicates that the woman observed was a small person.
The physical evidence located at the Dolly Gouge home indicates a struggle as evidenced by the destruction of the flower bed. The testimony of the three witnesses indicates that the person they observed was neatly dressed with her hair in place.
The area of the yard near Dolly Gouge's home on September 8, 1987, revealed a shoe, (one) dental plate and hair curler with hair in it, and a pair of glasses belong to Dolly Gouge (victim). ...
When Mrs. Gouge's body was located [12/23/87] near the Carr Cemetery some months after her disappearance, located nearby the body was her upper denture, hair rollers in her hair, and the shoe matching the one in the flower bed. ...
When Laverne Gouge Harris Craig [victim's daughter] left the home on the morning of September 8, 1987, Mrs. Gouge had on a colorful flowered robe, and this same robe was found at the Carr Cemetery . ...

11

One of the three witnesses at the bank described the person as a little old lady going to church--another remembers glasses.

Further, a reading of the record and Scott's opinion indicates overwhelming evidence of the guilt of the petitioner Harris.

Also, although not as clear as the above, serious doubt exists as to whether the three witnesses could have observed a photo of Dolly Gouge on the television at 12:00 noon on September 8, 1987. ...

Conclusions of Law and Fact

This Court is convinced beyond a reasonable doubt:

(A)  That, under the circumstances of the case and all the proof offered, this Court can see no probability of a different result had the information been revealed concerning the three witnesses;

(B)  That the absence of the three witnesses ... did not result in an unfair trial;

(C)  That the failure of the police to turn over the evidence did not result in a verdict unworthy of confidence;

(D)  This Court is convinced beyond a reasonable doubt that the evidence ... was not reliable when viewed under the full context of the other physical or oral proof offered at trial;

This evidence is so unreliable that it falls within the category of worthless.

Under the standard set forth in Edgin, we initially conclude the evidence was requested and that the state failed to reveal it.  The information was apparently contained in a police investigative file but was never turned over to the District Attorney's office.  The law, however, provides that "'suppression by police will be imputed to the prosecution ....'" State v. Davis, 823 S.W.2d 217, 219 (Tenn. Crim. App. 1991) (quoting Cason v. State, 503 S.W.2d 206, 208 (Tenn. Crim. App. 1973)).  Thus, the second Edgin factor has been satisfied.  Finally, the evidence was exculpatory.  If the jury believed that the witnesses at issue did see the victim at the bank at noon on September 8, the theory of the state, based entirely upon circumstantial evidence, would have been discarded.  Furthermore, that the petitioner was talking to police at the same time the victim was seen at the bank

12

would have been clearly exculpatory.

The remaining question is whether the evidence is material. Evidence is not material unless it creates "'reasonable probability' of a different result." Edgin, 902 S.W.2d at 390 (quoting Kyles v. Whitley, 115 S. Ct. at 1566). That is, it is not material unless it "'undermined confidence in the outcome of the trial.'" Id. We conclude the evidence is not material and will attempt to explain why.

When shown pictures of the victim as she appeared at the time of her death, none of the three women were able to say that the victim was, in fact, the woman they saw at the bank. Ms. Vaughn thought the woman they saw at the bank had lighter-colored hair and appeared smaller than the pictures of the victim indicated. When Ms. McQueen was asked if she could determine whether the woman at the bank looked like the victim, she responded, "I don't know. All I know is she [the lady at the bank] just looked like the lady that they showed on the TV that day, [that is] all I can really [say]." Ms. Crowe testified that the woman she saw at the bank was smaller than the victim and that the hair color was lighter.

The descriptions given by the woman at the bank contradict the undisputed evidence at trial relating to the appearance of the victim. The evidence established that the victim, when abducted, had rollers in her hair, was without part of her dentures, and was wearing a brightly-colored robe. None of the three women corroborated any of these details. When the body was discovered, authorities found hair rollers, the robe, and the single shoe that matched the one found in the flower bed. All of that corresponded with the trial testimony.

The state proved at the evidentiary hearing that the victim's picture

13

could not have been on the news at noon on the date of her disappearance. Authorities arrived at the scene at approximately 11:00 A.M. on September 8. Sheriff Crumley testified that he did not authorize a news release before noon on the date at issue and that it would have "been virtually impossible because from the time of the original call to noon was a relatively short period of time" in which to arrange the news for television.

At the conclusion of the hearing, the trial court observed that it was unlikely that the women, who were uncertain of the date of the event at the bank, had seen the victim's photograph on television at noon on September 8. That the women were uncertain about the date served to lessen the value of their testimony. That is especially so in light of the fact that none of the women could positively identify the female individual they saw at the bank as the victim.

Under the circumstances, any evidence favorable to the defense would have been somewhat helpful at trial. Yet the evidence offered by the state, while entirely circumstantial, was nonetheless overwhelming. All of this leads us to the conclusion that the testimony of the three women was not sufficiently material to warrant a new trial. Had they been more positive in their identification of the victim or if their description had more closely resembled the victim as she apparently appeared at the time of her disappearance, our conclusion may have been different.

To further explain our rationale, it may be helpful to examine cases where courts have found a Brady violation requiring reversal. In State v. Marshall, 845 S.W.2d 228 (Tenn. Crim. App. 1992), the defendant was convicted of first degree murder and received a life sentence. His attorneys discovered that the state had suppressed several statements of witnesses indicating that a Robert Thomas

14

"Astro" Coats had actually committed the crime. For example, one witness indicated that he had heard Coats state that he had killed the victim and then showed him the murder weapon. Coats' girlfriend, who also claimed to have overheard Coats confess to the crime, reported that Coats had directed her to serve as his alibi witness. Other witnesses heard Coats discuss his participation in the crime. This court found that had the evidence been disclosed, there was a "reasonable probability that the results of the trial would have been different." Id. at 234. See also State v. Spurlock, 874 S.W.2d 602 (Tenn. Crim. App. 1993).

Another instructive case is the United States Supreme Court's opinion in Kyles v. Whitley, 115 S. Ct. 1555 (1995). In that capital case, the primary issue was one of identity. Id. at 1569. The state, which relied primarily on the testimony of several eyewitnesses who identified Kyles as the killer, withheld from the defense the pretrial statements of two of the witnesses. The Supreme Court ruled that if the defense had been allowed to use those statements, "the value of ... those [two] witnesses would have been substantially reduced or destroyed." Id. at 1569. The state also suppressed pretrial statements of an informant who was nicknamed "Beanie." Many of Beanie's statements to the authorities indicated that he was the killer or that he had planted evidence tending to incriminate Kyles. The Court found that this information, had it been disclosed, would have substantially weakened the state's case and thus confidence in the outcome of that trial could not be maintained. Id. at 1575.

In our view, the evidence withheld in this case is not nearly as persuasive as in those reported cases in which new trials have been ordered. The quality of the suppressed testimony is simply insufficient to undermine our confidence in the results of the trial. In short, the evidence does not preponderate

against the determination that a new trial is not warranted.  See Edgin, 902 S.W.2d at 390-91.

(b)

The petitioner next argues that a Brady violation occurred when the state withheld evidence that there was some question as to whether the body found in the cemetery was that of the victim.  According to a T.B.I. memorandum,[1] the first medical person summoned to the cemetery originally believed that the skeletal remains had the appearance of being embalmed.  He originally thought the skull appeared to be that of a young woman.

While the trial court observed that this evidence might qualify as "arguably a cross-examination point," it ruled that the preliminary thoughts of the physician would not have benefitted the defense.  We agree with that assessment.

Again, the first three requirements established by the ruling in Edgin have been shown:  (1)  the defendant requested the information; (2)  the state failed to provide it; and (3)  it could have been exculpatory because it tends to suggest the body was not that of Dolly Gouge.  In our view, however, the evidence is not material.  The physician testified that additional testing demonstrated that the body had not been embalmed.  A closer examination of the skull indicated that the body was that of a woman at least in her fifties.  That he may have, on first impression, speculated that the body, found near a cemetery, had been embalmed or was that of a younger person, does not cast any real doubt on the substance of his testimony.  That evidence would have been only marginally relevant or useful in cross-examining Dr. McCormick.  Kyles v. Whitley, 115 S. Ct. at 1571.

---

[1] The record is undeveloped as to how the petitioner acquired possession of this document.

16

(c)

The petitioner next contends the state committed a Brady violation by withholding from the defense evidence that a witness could refute state witness Foster's testimony that the petitioner had vacuumed the trunk of his car on the day the victim disappeared.  At trial, Foster testified that after he was assigned to follow the petitioner, he observed him take his car to a carwash and park near the vacuum cleaner.  While the testimony suggested the petitioner might have vacuumed his car, Foster conceded that he could not determine whether he had actually done so.  Foster said that when he asked others who were present to confirm what the petitioner had done, they were unable to do so.

A T.B.I. memorandum, found sometime after the trial, however, provides as follows:  "At first, Sgt. Foster thought Ricky Harris vacuumed the trunk out.  However, another individual, who was close by advised Sgt. Foster that Ricky Harris did not vacuum the vehicle."  Thus, the memorandum could have been used to impeach Sgt. Foster's testimony that no one else saw anything about the petitioner while at the carwash.

Nonetheless, this evidence does not meet the materiality test.  While it might have called into question the inference that the petitioner had cleaned the interior of the car in an effort to destroy evidence of his crime, this is a minor point that, from our assessment of the record, would have only marginally weakened the state's case.  Due to the strength of the other convicting evidence, our confidence in the verdict is not affected in the least due to the state's failure to preliminarily advise the defense on this point. Edgin, 902 S.W.2d at 391.

17

(d)

Next, the petitioner argues a <u>Brady</u> violation by the state's suppression of evidence that Sgt. Foster had a felony record. During the 1960's, Foster was apparently convicted of offenses in the state of Louisiana. He ultimately received a pardon. This fact was not discovered by either the state or the defense until sometime after petitioner's trial.

There is no <u>Brady</u> violation. The duty to disclose evidence does not extend to information not in the possession or control of the prosecution. <u>Banks v. State</u>, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977). Because the parties stipulated that the state did not have this information in its possession or control until sometime after trial, there was no error. <u>Id.</u>

(e)

The petitioner's final claim based upon the ruling in <u>Brady</u> is that the state suppressed evidence that someone else had confessed to the murder. After trial, the petitioner's trial counsel received a copy of a letter that provided in part:

> [District Attorney General] David Crockett
> How can you live with yourself the way you do people in court? I wrote you a letter before you had the trial on Ricky Harris but you must have throw[n] it away because you didn't want a hole in your plan. I told you in that letter that Ricky Harris did not do any murder. I was the one that did it. ... I wanted to let you know that me and the other two family members got by with it. You police people are so stupid.
> Bill

When trial counsel, after reading a copy of the letter, contacted the District Attorney, she was informed that he had forwarded her the letter as soon as he received it. He denied having received any correspondence before the trial. After hearing proof on the matter, the trial court determined "that District Attorney

18

Crockett was absolutely truthful in his testimony that he received no pre-trial letter from 'Bill.'" This factual finding is binding on this court unless the evidence preponderates against it. Edgin, 902 S.W.2d at 389. It does not. Because the state did not have any information about a confession before the trial, the state cannot be held to a requirement of disclosure. Banks, S.W.2d at 90.

In Kyles v. Whitely, the Supreme Court ruled that one aspect of materiality is that the "suppressed evidence [must] be considered collectively, not item-by-item." 115 S. Ct. at 1567. We have reviewed the substance of each of the items not disclosed to the defense (the possible sighting of the victim and the relevant information contained in the T.B.I. memorandum). Our determination is that none of the items, standing alone, qualified as material. Our conclusion is the same after examining the collective evidence withheld by the state. In the context of the entire record, the failure on the part of the state to disclose the evidence at issue does not affect our confidence in the verdict. Even if the petitioner had known of this evidence, it is our view that the outcome of the trial would not have been different. Id. at 1566. In Edgin, the supreme court ruled that the petitioner must show a Brady violation by a preponderance of the evidence. 902 S.W.2d at 389. The evidence does not preponderate against the trial court's ruling that the petitioner failed to carry this burden.

Our ruling on this issue is not designed to encourage prosecutors to disregard their legal and ethical responsibility to disclose evidence that might be construed as exculpatory. The United State Supreme Court has commented extensively on the duty to disclose evidence favorable to the defense. "[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. ... This is as it should be. Such disclosure will serve to justify

trust in the prosecutor as the 'representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case but that justice be done.'" Kyles v. Whitley, 115 S. Ct. at 1568 (citations omitted).


II

The petitioner also argues that his trial counsel was ineffective for the following reasons:

> (a) failure to object to venue when the body was found in Washington County and the petitioner was tried in Carter County;

> (b) failure to request DNA testing when the remains of the victim were identified only by articles of clothing that were found near the body;

> (c) failure to request special jury instructions regarding identification;

> (d) failure to object to the introduction of testimony regarding a police dog's ability to smell hospital odors; and

> (e) failure to object to erroneous, confusing jury instructions.


When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). Should the petitioner fail to establish either factor, he is not entitled to relief. Recently, our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the

20

> components in any particular order or even address both
> if the defendant makes an insufficient showing of one
> component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).


On claims of ineffective counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). On appeal, any findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderates against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). This court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Questions concerning the credibility of witnesses and weight and value to be given their testimony are for resolution by the post-conviction court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).


(a)

The petitioner's first argument is that trial counsel was ineffective for failing to object to venue. The body was found in Washington County but he was tried in Carter County. Counsel for the petitioner sought a change of venue based upon the substantial amount of pretrial publicity. The request was denied. The petitioner now argues that his trial counsel should have also alleged, as an

21

alternative ground, that the crime was not committed in Carter County.

The trial judge concluded that a motion for change of venue on that basis "would have been to no avail" because the circumstantial evidence suggested that substantial parts of the crime were committed in Carter County, thus establishing proper venue. The trial court also ruled that "if one or more elements of a crime are committed in one county and other elements in another, the offense may be prosecuted in either county." We agree.

Article 1, Section 9 of the Tennessee Constitution provides in part that in all criminal prosecutions, the accused has the right to a "speedy public trial, by an impartial jury of the county in which the crime shall have been committed ...." See Tenn. R. Crim. P. 18. The state has the burden of proof that the offense was committed in the county of the indictment. Harvey v. State, 376 S.W.2d 497 (Tenn. 1964). Venue may be shown by a preponderance of the evidence which may be either direct or circumstantial or both. Hopper v. State, 326 S.W.2d 448 (Tenn. 1959). Rule 18(b) provides that "[i]f one or more elements of an offense are committed in one county and one ore more elements in another, the offense may be prosecuted in either county." Tenn. R. Crim. P. 18; see State v. Knight, 616 S.W.2d 593 (Tenn. 1981); State v. Reed, 845 S.W.2d 234, 238 (Tenn. Crim. App. 1992).

There was, in fact, circumstantial evidence that the victim was abducted in Carter County. There was also proof that the petitioner had monitored the victim's home and awaited an opportunity to accost her without being detected. These facts establish both premeditation and deliberation, critical elements for first degree murder.

22

The petitioner also complains that his trial attorneys did not ensure an appropriate jury instruction on venue. The trial court charged the jury as follows:

> Before you can find the defendant guilty of any offense, you must find that the State has proved each and every element of the offense beyond a reasonable doubt and further that the offense occurred before the commencement of the prosecution, and it occurred in Carter County, Tennessee, by a preponderance of the evidence.

See Tenn. Pattern Jury Instruction 2.04 (2d ed. 1988).

The petitioner complains that the following instruction should have been provided:

> The burden is upon the state to prove by a preponderance of the evidence that this offense was committed in Carter County, Tennessee.
> Proof by a preponderance of the evidence means that the greater weight of the evidence must be in support of the state's contention.
> Venue of the offense lies in the county where the offense was commenced or consummated.
> If you find that the state has failed to prove by a preponderance of the evidence that this offense was commenced or consummated in Carter County, Tennessee, then you must return a verdict of not guilty.

See Tenn. Pattern Jury Instruction 2.05 (2d ed. 1988).

In our view, the instruction given, although brief, is an accurate statement of the law on venue. The jury was charged that it had to find by a preponderance of the evidence that the crime was committed in Carter County and that, if it did not so conclude, it had to find the defendant not guilty. See Tenn. Pattern Jury Instruction 2.04 (2d ed. 1988).

(b)

The petitioner next complains that his trial attorneys were ineffective

23

for failing to seek DNA testing to confirm the identity of the body. He argues that the body was identified only by the articles of clothing that were found nearby.

The trial court made the following finding:

At the time of trial, DNA evidence was in its legal development stage at best, and trial counsel could not be faulted for failing to recognize that DNA might have offered some aid at trial.

\*\*\*

Considering the overwhelming evidence concerning the identification of the victim, it could not be stated that DNA would have rendered any aid to the defendant's theory.
Original trial counsel was not ineffective under due process standards or Sixth Amendment standards.

We agree. The petitioner was tried in 1988. In 1990, this court ruled that "[i]f a scientific development with forensic application is not generally known to the Tennessee courts and attorneys who are involved with the administration of criminal justice, then a defense attorney's unknowing failure to pursue such a development ... does not necessarily render him ineffective." State v. Overbay, 806 S.W.2d 212, 215 (Tenn. Crim. App. 1990). In Overbay, the petitioner sought to challenge his 1987 convictions based on trial counsel's failure to seek DNA testing. In rejecting the claim the court made the following observation:

In People v. Castro, 545 N.Y.S.2d 985, 986 (1989) the reliability and forensic application of DNA print identification was considered a "fascinating and novel issue." In 1988, it was noted to be "at the 'cutting edge' of forensic science." People v. Wesley, 533 N.Y.S.2d 643 (1988). The first reported appellate opinion dealing substantively with the issue of DNA testing appears to be Andrews v. State, 533 So. 2d 841 (Fla. Dist. Ct. App. 1988) which recognized that the issue was novel. 533 So. 2d at 846, n.4. .... [T]his court [has] held that if a legal issue, although in existence, was not generally known to the bench and bar when a particular case went to trial, then it could not be said that the attorney in that trial was ineffective for failing to raise the issue.

24

<u>Overbay</u>, 806 S.W.2d at 214-15 (parallel citations omitted).

Here the trial commenced two years before the opinion in <u>Overbay</u> was released. The use of DNA testing in the criminal justice arena was not an established practice at that time. <u>Id.</u> While we acknowledge the petitioner's argument that DNA testing was available in 1988 through the FBI and was discussed in newspaper articles and law review journals, the recognized standard for the effective assistance of counsel does not require that the attorney "read[] all cases and scientific journals published across this nation." <u>Id.</u> at 215. The test is whether the scientific procedure at the time of the trial was "generally known to the Tennessee courts and attorneys." <u>Id.</u> Clearly, DNA testing was not generally known in Tennessee at the time of his trial. Thus trial counsel cannot be found deficient for failing to seek testing.

Of greater importance is that the petitioner has not met the second requirement of the ruling in <u>Strickland</u>. The petitioner has failed to establish prejudice--that there is a "reasonable probability" that but for counsel's deficient performance "the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. In <u>Davis v. State</u>, 912 S.W.2d 689, 698 (Tenn. 1995), the petitioner argued his counsel was ineffective for failing to seek additional serological testing. Our supreme court ruled that "since the petitioner presented no evidence of what serological testing would have shown and of how it would have benefitted him, he failed to demonstrate any prejudice." <u>Id.</u> at 698. The petitioner has offered no proof as to what DNA testing would have shown. This court cannot speculate about the issue; there must be a demonstration of prejudice.

(c)

The petitioner next argues that his counsel was ineffective for failing to request special jury instructions regarding the identification issue. The following instruction was provided:

> Identity. The State must prove beyond a reasonable doubt the defendant's identity as the person who committed the crime.
>
> If, after considering all of the evidence in this case, you the jury are not satisfied beyond a reasonable doubt that the defendant is this person, then you must find him not guilty.

See Tenn. Pattern Jury Instruction 37.17 (2d ed. 1988).

The petitioner contends that United States v. Telfaire, 469 F.2d 552 (D.C. Cir. 1972), is the "penultimate authority on eyewitness identification jury instructions." In Telfaire, the federal court recognized the difficulties associated with identification testimony and adopted a more comprehensive instruction. Id. Until 1993, Tennessee courts consistently rejected the Telfaire instruction. See State v. Ward, 712 S.W.2d 485, 488 (Tenn. Crim. App. 1986); State v. Moore, 713 S.W.2d 670, 676 (Tenn. Crim. App. 1985); State v. Wooden, 658 S.W.2d 553, 557 (Tenn. Crim. App. 1983). In 1993, an opinion filed in this court departed from the traditional rule and held that "in any criminal case in which the issue of identity is raised by the evidence and is material to the defense the detailed identification instruction first devised in Telfaire ... must be given." State v. Dennis Lee Dyle and William Whitfield Ellis, No. 03C01-9209-CR-00332, slip op. at 10 (Tenn. Crim. App., at Knoxville, Nov. 16, 1993), rev'd, 899 S.W.2d 607 (Tenn. 1995). On appeal, however, our supreme court ruled that while a more detailed instruction on identification testimony was required, the Telfaire instruction impermissibly commented on the evidence. Instead, the court promulgated a new identity instruction which must be given in all cases where identity is a material issue and

26

the instruction is requested.  Dyle, 899 S.W.2d at 612.

In our view, trial counsel was not ineffective for failing to request an instruction that would have been denied.  Counsel would have had no obligation to anticipate that in 1995, almost eight years after the trial in question, the supreme court would depart from a long line of cases holding supplemental instructions on identity are not required.  See Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).  See also Larry J. Cawthon v. State, No. 02C01-9702-CR-00064 (Tenn. Crim. App., at Jackson, July 29, 1997) (holding counsel was not ineffective for failing to request a special jury instruction on eyewitness identification, when the case was tried prior to Dyle).

(d)

The petitioner next argues that his trial counsel was ineffective for failing to object to testimony by Officer J.D. Toth that his police dog had alerted him to hospital-like odors at the victim's residence.  The transcript of the trial, however, demonstrates that Officer Toth did not testify to that.  In fact, the officer testified that the dog "gave no indication that there was a strange odor."  Harris, slip op. at 37. Because the dog was unable to track the scent of the victim, Officer Toth concluded that she did not walk away from the residence.

(e)

The petitioner next argues his trial counsel was ineffective for failing to object to several of the jury instructions.  First, he complains about the following instruction on reasonable doubt:

> Reasonable doubt is that doubt engendered by an
> investigation of all the proof in the case, and an inability
> after such investigation, to let the mind rest easily as to
> the certainty of guilt.  Reasonable doubt does not mean a

27

possible or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.

The petitioner argues this instruction violated the standards set forth in Victor v. Nebraska, 511 U.S. 1 (1994). In Victor, the United States Supreme Court ruled that a jury might "understand [the instruction containing the phrase 'moral certainty'] to allow conviction on proof that does not meet the beyond a reasonable doubt standard." 511 U.S. at 13. The Court ruled, however, that a reasonable doubt instruction that contained the phrase "moral certainty" might nonetheless comport with constitutional guidelines if used in conjunction with other phrases that lend content to the phrase. Id. at 15.

In State v. Nichols, 877 S.W.2d 722, 734-35 (Tenn. 1994), our supreme court considered a challenge to a jury instruction which included the term "moral certainty" used in conjunction with a charge that "[r]easonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict." Id. The court concluded that the instruction properly reflected "the evidentiary certainty required by the 'due process' clause of the federal constitution and the 'law of the land' provision in our state constitution." Id. In our view, Nichols controls in this instance. Thus, trial counsel cannot be found ineffective for failing to object to the instruction. See also State v. Bush, 942 S.W.2d 489, 520-21 (Tenn. 1997) (upholding the constitutionality of an instruction almost verbatim to the instruction given in petitioner's case), cert. denied, 118 S. Ct. 376 (1997); contra Rickman v. Dutton, 864 F.Supp. 686 (M.D. Tenn. 1994), aff'd, 131 F.3d 1150 (6th Cir. 1997), cert. filed (Mar. 2, 1998).

28

The petitioner also argues counsel was ineffective for failing to object to the following instruction on malice:

> Malice is an intent to do any injury to another, a design formed in the mind to doing the mischief to another.
>
> Express malice is actual malice against the party slain, and exists where a person actually contemplates the injury or wrong he inflicts.
>
> Implied malice is malice not against the party slain, but malice in general, or that condition of mind which indicates a wicked, depraved and malignant spirit and heart regardless of social duty and fatally bent on mischief. ...
>
> In this event there is implied such a high degree of conscious and willful recklessness as to amount to that malignity of heart constituting malice.
>
> Likewise if a deadly weapon is handled in a manner so as to make the killing a natural and probable result of such conviction of murder in the first degree, but again this inference may be rebutted by either direct or circumstantial evidence, or by both regardless of whether the same be offered by the defendant or exists in the evidence of the State. A "deadly weapon" is any weapon or instrument which from the manner in which it is used or attempted to be used is likely to produce death, or cause great bodily injury.
>
> &ast;&ast;&ast;
>
> You are reminded that the State always has the burden of proving every element of the crime charged, beyond a reasonable doubt.
>
> A permissible inference may or may not be drawn from an elemental fact from proof by the State of a basic fact. However, all inferences permitted to be drawn may be rebutted.
>
> An inference does not place any burden of proof of any kind upon the defendant.

In Sandstrom v. Montana, 442 U.S. 510 (1979), the United States Supreme Court ruled that jury instructions that relieve the prosecution of the burden of proving an essential element of the offense are unconstitutional. Here, the petitioner argues that the instructions given at his trial impermissibly shifted the burden of proof on the element of malice.

In State v. Bolin, 678 S.W.2d 40, 43 (Tenn. 1984), the jury was

29

instructed that "the use of a deadly weapon ... raises a presumption of malice unless rebutted by other facts and circumstances to the contrary...." After examining the particular instruction at issue and the full charge in its entirety, our supreme court upheld the conviction because no "jury could have interpreted the ... instruction as mandatory or conclusive or as shifting to the defendant the burden of persuasion on the element of malice." Id. at 44. The court did, however, offer the following warning:

> In the wake of Sandstrom, no state court of last resort can fail to recognize that it is prudent to warn trial judges that the word "presumption" should not be used, except in instructing on the presumption of innocence. In its place juries may be instructed that a permissible inference may or may not be drawn of an elemental fact from proof by the State of a basic fact, but that such inference may be rebutted and the inference places no burden of proof of any kind upon defendant.

Id. at 44-45 (footnote omitted).

Here, the jury was not permitted to presume malice. The trial judge charged that the inference of malice could be rebutted, that the jury did not have to draw the inference, and that the inference imposed no burden of proof on the defendant. In consequence, counsel could not have been ineffective for failing to object to the instruction.

The petitioner also argues that his counsel was ineffective for failing to object to jury instructions which inadequately explained premeditation and deliberation. In State v. Brown, 836 S.W.2d 530 (Tenn. 1992), decided four years after the trial of this case, our supreme court clarified the terms, concluding that each of these elements was separate and distinct from the other.

In Overton v. State, however, our supreme court discouraged use of

30

failure to object to jury instructions as a basis for ineffective assistance. 874 S.W.2d 6 (Tenn. 1994). In Overton, the trial judge charged the jury on the elements of aggravated rape as defined at the time of trial rather than as defined at the time of the offense. The petitioner argued his counsel was ineffective for failing to object to the incorrect jury instructions. Our supreme court rejected the claim:

> Although this instruction may well have constituted reversible error in this case [on direct appeal], we agree ... that it is not a cognizable ground for relief in a post-conviction petition. Relief may be granted on a post-conviction petition only when the sentence or conviction is void or voidable because it contravenes a state or federal constitutional right of the defendant. Moreover, to allow every error committed by the trial court to be recast in a post-conviction petition as an ineffective assistance of counsel allegation would be to subvert the limited purposes of the post-conviction procedure.

Id. at 11-12.

The reasoning in Overton has been applied to the question of whether counsel can be found ineffective for failing to object to instructions on deliberation and premeditation. In State v. Edwin E. Jesperson, No. 03C01-9602-CC-00058 (Tenn. Crim. App., at Knoxville, Jan. 28, 1997), this court rejected the claim.

Moreover, the primary issue in this case was one of identity. The theory of the state was that the petitioner watched the victim's house through a pair of binoculars, waited until everyone but the victim had left, and then subdued the victim with some type of chemical. This theory, fully accredited by the jury, presented a classic case of premeditated, deliberate first degree murder. The proof implied a plan or design on the part of the petitioner and there was every indication that he acted with a cool, deliberate purpose. Thus, any failure to object to the jury instructions on these elements of the crime, when the single issue was one of identity, could have had no impact on the trial.

31

The petitioner also complains that counsel failed to object when the trial court provided instructions on the cause of death, the meaning of a dangerous wound, the use of a deadly weapon, and the absence of a material witness. The petitioner argues that none of these instructions were supported by the evidence and argues that they served only to confuse the jury.

Certainly, any jury charge should be given only when raised by the evidence. These topics, however, had little bearing on the results of this trial. That these instructions were given would not undermine our confidence in the verdict. Strickland, 466 U.S. at 686.

III

The petitioner filed a pro se brief in support of his post-conviction counsel's claims. If a person is represented by counsel, however, he has no right to proceed pro se. State v. Burkhart, 541 S.W.2d 365 (Tenn. 1976). In Burkhart, the court stated the rule as follows:

> In all criminal prosecutions the accused has the right to testify as a witness in his own behalf and to be represented by counsel.
>
> He does not have a constitutional right under the State or Federal Constitution to participate In propria persona in his own defense and simultaneously to be represented by participating counsel.
>
> He may conduct his own defense without benefit of counsel or with an attorney present in the capacity of 'elbow counsel.'
>
> The choice is his; he represents himself or he is represented--one or the other, but not both.

Burkhart, 541 S.W.2d at 371. See also Kenneth Campbell v. State, No. 01C01-9409-CR-00321, slip op. at 3 (Tenn. Crim. App., at Nashville, June 1, 1995) (applying the rule in Burkhart to the post-conviction setting).

32

In addition to the issues raised by his counsel, the petitioner contends that (1) the trial court erred by failing to instruct the jury in deliberating the issues and reporting its verdict; (2) the trial court erred by failing to properly instruct the jury on various issues; and (3) the petitioner's case should not be given harmless error analysis.

These issues are waived. In the post-conviction context, a ground for relief is waived "if the petitioner knowingly and understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-112(b)(1)(repealed 1995). Our supreme court has held that "the rebuttable presumption of waiver is not overcome by an allegation that the petitioner did not personally, knowingly, and understandingly fail to raise a ground for relief." House v. State, 911 S.W.2d 705, 714 (Tenn. 1996). The court continued, "[w]aiver ... is to be determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney." Id. Clearly, each claim was available on direct appeal.

The petitioner also argues that State v. Brown, 836 S.W.2d 530 (Tenn. 1992), should be applied retroactively to his case. In Brown, our supreme court ruled that because of potential juror confusion, trial courts should no longer instruct the jury that the premeditation required to sustain a first-degree murder conviction can be "formed in an instant." Yet, this court has repeatedly held that Brown did not announce a new constitutional principle. Thus, retroactive application is not permissible. See, e.g., Lofton v. State, 898 S.W.2d 246, 250 (Tenn. Crim. App. 1994). Thus, the issue is without merit.

The petitioner's final contention is that the state failed to prove venue, a state constitutional prerequisite. As stated previously, however, there was ample evidence to establish venue in Carter County. This issue is clearly without merit.

Accordingly, the judgment of the trial court is affirmed.

_____
Gary R. Wade, Judge

CONCUR:

_____
Paul G. Summers, Judge

_____
William M. Barker, Judge