IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

MAY 1996 SESSION

FILED

October 29, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9510-CC-00324 |
| | ) | |
| | ) | Davidson County |
| v. | ) | |
| | ) | Honorable Walter C. Kurtz, Judge |
| | ) | |
| ALLAN BROOKS, | ) | (First degree murder) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

John E. Herbison
2016 Eighth Avenue South
Nashville, TN 37204

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
Charlotte H. Rappuhn
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

Victor S. Johnson, III
District Attorney General
        and
Roger Moore
Rene Erb
Assistant District Attorneys General
Washington Square, Suite 500
222 Second Avenue North
Nashville, TN 37201-1642

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Allan Brooks, appeals as of right following a jury conviction in the Davidson County Criminal Court for first degree murder.  The trial court sentenced the defendant to life imprisonment in the custody of the Department of Correction and ordered the defendant to serve the life sentence consecutively to an earlier sentence for a drug offense.  The defendant presents the following issues for our review:

> (1) whether the collateral estoppel component of the Double Jeopardy Clause was violated when the trial court allowed the state to seek a conviction for willful, deliberate, and premeditated murder;
>
> (2) whether the evidence is sufficient to prove all elements of premeditated and deliberate murder beyond a reasonable doubt;
>
> (3) whether the trial court erred by admitting into evidence the victim's statement that the defendant held a gun to her head during an earlier incident;
>
> (4) whether a witness' testimony that the defendant threatened to kill her constitutes prejudicial error;
>
> (5) whether the testimony of Lilly Rose exceeded the proper scope of rebuttal;
>
> (6) whether the state committed prejudicial errors during final argument;
>
> (7) whether the trial court erred by denying the defendant's request for special instructions;
>
> (8) whether the trial court erred by giving the jury a sequential instruction;
>
> (9) whether the cumulative effect of the errors rendered the trial fundamentally unfair;
>
> (10) whether the trial court erred by ordering the defendant's sentence to be served consecutively to an earlier sentence; and
>
> (11) whether the automatic imposition of a life sentence upon conviction for first degree murder when the state is not seeking

the death penalty violates the equal protection component of the Tennessee Constitution.

We affirm the judgment of conviction.

The defendant was first charged on January 26, 1990, with first degree premeditated and deliberate murder, murder committed during the attempt to perpetrate a felony, and burglary with the intent to commit murder of his estranged girlfriend, Amy Peyton. The defendant was convicted by a jury of first degree premeditated and deliberate murder and was acquitted of the felony murder and burglary charges. The murder conviction was reversed, and the case was remanded for a new trial based on the trial court's error in jury instructions regarding deliberation and premeditation. See State v. Brooks, 880 S.W.2d 390, 393 (Tenn. Crim. App. 1993). At the second trial, which forms the basis for this appeal, the defendant was found guilty of first degree murder and sentenced to life imprisonment.

Cody Albin, who lived in the apartment directly above the victim, testified that on August 20, 1989, she heard a door slam at about 5:02 a.m., and then she heard a man and a woman begin to argue in the apartment below her. Albin said she remembered the time because she always arose at 5:00 a.m. to get ready for work, and her alarm had sounded when she heard the door slam. She said she began to get ready for work, but she stopped to dial 9-1-1 when she heard bloodcurdling screams coming from the woman downstairs. Albin testified that the screaming sounded like someone was being killed. She stated the woman was screaming, "No. Please. Don't. Stop." Albin said she also heard sounds like an object was being thrown from wall to wall. She testified that the noise stopped after five to six minutes, and then there was silence for approximately two minutes. She said at the end of the silence, she heard a gunshot. She stated she knew the sound was a gunshot because she had dated a policeman and was familiar with the sound that a gun makes when it is discharged.

3

Colleen Critton testified that she lived in an apartment a few floors above the victim. She testified that she heard screaming at approximately 5:00 a.m. but that she thought initially the noise was caused by cats. She said eventually she looked out her window and saw a little boy, whom she later learned was the victim's six-year-old son, Josh Peyton, running up the sidewalk and screaming. She said Josh appeared terrified, frantic and scared. She said when she ran downstairs to talk to him, Josh told her his mother was dead. She said as they walked back to the victim's apartment together, Josh said to her, "You don't want to go in there. There's blood everywhere." She said she took Josh back to her apartment and called the police. She stated Josh did not mention the defendant's name and there was no blood on Josh when she found him.

Josh Peyton, who was six years old at the time of the shooting, testified that he witnessed the argument between the defendant and his mother and the shooting. He said his infant brother, who is the defendant's and the victim's son, was also in the apartment at the time. He stated he was asleep when his mother came home, but the sounds of the defendant and his mother fighting awoke him. He said his mother was screaming, and she told Josh to get out of the house. He said he tried to use the front door but it was stuck. He said the defendant was hitting his mother, and his mother was trying to hit the defendant. He stated his mother had no weapon and was lying on the couch while the defendant was hitting her, with her head back and her feet out in front of her on the floor.

Josh said he tried to use the sliding glass door to get out but could not open it. He testified that as he was trying to leave, he saw the defendant shoot his mother. He said he did not hear anything as the gun discharged, but he saw a light come from the gun. He said his mother was on the couch when she was shot, and the

4

defendant was beside her with a silver gun in his hand. He said he was uncertain whether the defendant was in the living room the entire time Josh was trying to open the door, but Josh remembered the defendant was only in the room for a minute after his mother was shot. He said the defendant did not go to another part of the apartment before the defendant left. Josh testified that he tried to follow the defendant as the defendant left, but the defendant told him to go back inside the apartment.

Josh admitted that when he was interviewed by a police officer the morning of the shooting, he told the officer the defendant "shocked" his mother and stated he did not mean "shot" as in gunshot when the officer questioned him regarding the meaning of his statement. He testified that this statement referred to the fact that he saw a light when his mother was shot. Josh said he now realizes his mother was shot, and the light he saw came from the gun.

Officer Raymond Rader testified that he received a domestic call to the victim's apartment at 5:08 a.m. on August 20, 1989. Officer Rader said shortly thereafter he received a second call telling him the same incident was now an emergency. He testified that he arrived four to five minutes later and saw the victim's body on the couch when he entered the apartment. He said the body was not moving and there were no vital signs. He said he did not move the body but noted that the victim's face and clothing were covered in blood. Officer Rader said he secured the scene to prevent contamination.

Officer Ronald Wilson testified that he measured the victim's apartment and took pictures. He said he noted a footprint on the front door, and the door latch was broken. He said bloodstains were found on the door latch, handle, and surrounding areas.

Officer Richard Winfrey testified that he assisted in processing the evidence at the victim's apartment. He said he found a spiral notebook and a pen on the bed in the bedroom, and the pen and notebook both had what appeared to be blood on them. The notebook, which was introduced into evidence, contained a note which stated, "I Allan, am going to kill Amy and myself. I'm sorry but she has messed with my life for the last time[.] Les, Linda, Mom, Edward and especially Preston I love you. Allan." Officer Winfrey said he also found a bullet and a copper jacket embedded in the cushion of the couch, and a shell was found under the victim.

Sergeant Darrell Ryan testified that he took pictures and processed the body. He stated the body of the victim was on the living room sofa when he arrived. He said the pillow was behind the head, blood was on the body, legs, stomach and saturated into the victim's clothing, and blood was on the victim's left arm where it flowed from the victim's head because of the gunshot wound to her face. He said he rolled the body over and found the copper jacket that was located between the body and the couch. He stated he saw a bullet exit wound in the back of the victim's neck and then searched the couch and discovered the bullet behind the sofa cushion.

Sergeant John Hunter, an expert in blood spatter analysis, testified that he arrived at the victim's apartment while the body was still there. He said it was unusual that there was no high velocity spatter from the bullet's exit wound, but it may have been because the spatter was caught by the victim's hair. He said blood pooled under the sofa cushions and ran to the floor. He also said there was blood on the furniture, ceiling, and walls. He testified that the blood on the venetian blinds and the chair in the living room was expectorant, which is blood that is coughed up or spit out of the mouth. He said he found impact spatters on the venetian blinds above the chair, and this spatter type is created when a bloody object impacts something else. He said these spatters indicate the blood originally came from the area in front of the chair, and

6

the spatters were consistent with someone being hit while seated at or standing in front of the chair. He also stated there were transfer and low velocity spatter stains, and the blood spattering was consistent with someone being beaten in the living room by numerous strikes. He said a single blow would not cause spattering.

Sergeant Hunter testified that he also found transfer stains in the hallway that led to the two bedrooms and that the stains were transferred from a bloody object that was in motion. He said the stains in the hallway were about torso height and were consistent with a bloody body brushing against the wall while walking down the hallway. He said he found additional bloodstains in the bedroom on the door casings, floor, bed, chest of drawers and the clothes within the drawers. He said these stains were free-flowing or transfer stains. He said the dresser drawer was broken at the joint, which is not necessarily evidence of a struggle but is also consistent with pulling the drawer out forcefully.

Sergeant Larry Lewis, of the Daytona Beach, Florida Police Department, testified that the defendant was arrested on August 25, 1989, at a mall in Daytona Beach, and the police discovered at the shopping mall a Toyota stolen by the defendant. He said the police found numerous documents in the defendant's name in the car. He said the police also found a .357 firearm in the car, and the weapon had four live rounds. He said two rounds had been fired. He said the police found a small amount of cocaine, a pornographic tape, and some men's clothing and toiletry items in the car.

Tommy Heflin, a forensic sciences agent with the Tennessee Bureau of Investigation, testified that he examined the defendant's gun. He said the gun functioned properly, and the safety mechanism was working. He said the gun was tested to see if it would go off accidentally when hit or dropped, and the test was

7

negative. He said when the gun is fired, it ejects a bright flash of light in addition to powder and primer residues, and when fired at bare skin, the gun leaves reddish markings or small burns called powder tattooing. He testified that these markings show the gun was fired within twenty-four inches of the target. He said heat is created when a gun is fired, and the heat would burn one's hand if it were placed on the barrel at the time of firing. He said his tests revealed the copper jacket found in the victim's apartment was fired from the gun admitted into evidence. On cross-examination, he said it is possible for one to hold the barrel of the gun while it is fired and not get burned.

Dr. Mona Harlan, the former medical examiner for Davidson County, testified that she performed the autopsy on the victim's body. She testified that the cause of death was a gunshot wound that entered at the top of the cheek, just outside the left eye, and exited the back of the neck below the hairline. She said the barrel of the gun was about three to twelve inches from the victim when she was shot. Dr. Harlan said the victim suffered bruising to the lips, gums, and face, tearing of the skin, bruising to the left side of the chin and cheek, extensive bruising on the right side of her face, black eyes, a star-shaped tear on the right side of her scalp, and a broken nose. She said the victim was probably alive when she received these injuries because dead people usually do not bruise.

Dr. Harlan testified that the victim also received injuries to her ear that were caused by either a significant force or an object with an edge being swung at the victim. She said the object could have been a gun similar to the defendant's gun. She testified that the sharp tear wound also could have been caused by impact with the gun. She said the left side of the victim's brain was bruised, probably by a blow to the opposite side of the head or a strike directly over the affected area. Dr. Harlan said the victim had extensive bruising to the lips and split gums that were caused by at least

8

three separate impacts to the mouth area. She said that from the injuries sustained, the victim could have been comatose, awake and confused, or awake and alert yet weakened before she was shot. She said the only fatal wound was the gunshot wound.

Dr. Harlan testified that she did a blood and urine analysis that showed the victim had something alcoholic to drink the night of the shooting, but there was not enough alcohol in her blood stream to have affected her behavior. She said the victim had injuries to her arms and hands, and the victim's arm was probably up against her face when she was shot. She testified that there were no burns on the victim's hands to indicate that she had her hand on the weapon when it was fired. She said a gunshot residue test was not possible because of the amount of blood the victim had on her hands when her body arrived for examination. Dr. Harlan said when the victim was shot, she had to have been in a position similar to that in which her body was found when the police arrived.

Donna Beavers, a friend of the victim, testified that she met the victim in September 1988 at the bank where they worked together and that they saw each other socially several times each week. She said the victim had dated the defendant before she and the victim were friends, and the victim started dating the defendant again in the beginning of 1989. She said she and the victim and two men decided to go out on August 19, 1989. She said they went to a softball party then to Patrick's, a local bar. She said the victim had made plans to meet the defendant at Patrick's. She testified that when they arrived at the bar, the defendant was there and he and the victim got into an argument. She said the defendant threw a drink on the victim then reached for the victim's drink and punched a man who tried to intervene. She said both men were taken out of the bar. She said when Patrick's closed, the victim drove them home because she had not had much to drink, and at 4:00 a.m. they dropped the victim off at her apartment.

9

Beavers testified that the victim told her the defendant pointed a gun at her forehead in the parking lot of Patrick's in July 1988. She said the victim, who appeared very excited, told her about the incident when Beavers arrived at the victim's car just after the incident occurred. She said neither she nor the victim reported the incident to the police. She admitted that in the past, other incidents had caused the victim to seek restraining orders on the defendant, and she did not know why the victim did not report that particular incident to the police. Beavers testified that the relationship between the victim and the defendant was stormy but that on August 18, 1989, the victim told her she and the defendant had decided they were going to be friends and date other people. She said this decision seemed to relieve the victim. She said she had never seen a gun in the victim's apartment.

The defendant testified that he graduated with honors from the University of Tennessee and that he had attended one year of law school in 1980-81. He said his sources of income before the shooting included selling real estate, cocaine, and marijuana, and his primary source of income during the time he dated the victim was selling cocaine. He said he heavily used cocaine, using a minimum of one gram per day and sometimes as much as one eighth to one quarter of an ounce. He explained that the combination of alcohol and cocaine caused him to lose his sense of judgment, and he testified about several incidents when he was high on cocaine and his impaired judgment caused him to do irrational things, such as confronting a mugger who had a knife.

The defendant testified that he and the victim had a son together, but they had a sporadic relationship. He said he and the victim lived together at one point, but he asked her to leave his house after an argument. He said they began dating again in April 1989, but the victim would start arguments with him when he received calls from other women. He admitted he consorted with prostitutes, and this caused problems in

10

their relationship.  The defendant stated their relationship was going well in April 1989, but they broke up in July because they began having problems.  He said he never pointed a gun at the victim.  He said on August 18, 1989, he and the victim reconciled and came to an agreement to act civilly toward each other and to date other people.

The defendant said his friend, Les Rawding, gave him a gun to use for protection from the jealous boyfriend of one of the defendant's female friends.  He said the gun was usually unloaded.  He said he did not like to have the gun in his home, and it was never in his car.

The defendant testified that on the night of August 19, 1989, he met Les Rawding at the Boardwalk Café, and he started drinking, doing cocaine and smoking marijuana.  He said he left to meet the victim at Patrick's about midnight and when the victim arrived, she was angry because she had intercepted a message from another female on his answering machine.  The defendant said he and the victim fought, then a man stepped between them, and the defendant hit the man.  He said the bouncer threw him and the other man out of Patrick's, but he got into another fight in the parking lot with a different man.  He said that when he left Patrick's at about 12:30 a.m., he was intoxicated, and he went to other bars to continue drinking.

The defendant testified that when he arrived home between 3:00 and 4:00 a.m., his briefcase, a gun, some cash, and cocaine were missing from his house.  He said he suspected the victim and called her, but she denied breaking into his house and hung up on him.  He said he left his house to go to the victim's apartment to retrieve the missing items at about 5:00 a.m., and he was angry, frustrated, and irritable.  He said he had a key to the victim's apartment, but he did not bring the key with him.

11

The defendant testified that he was in an alcoholic stupor when he arrived at the victim's apartment. He said he kicked in the door because he knew his missing gun was in the victim's apartment, and he knew from experience she would threaten him with the gun. He said the victim was standing in the living room when he entered the apartment. He said he saw his briefcase on the counter and asked her for his things. He said the victim reached down into her pocketbook and pulled out a silver object which he suspected was the gun. He said he rushed toward her, they both began to struggle for the weapon, and she began to yell, "Help me." He stated their voices were loud, and he began to beat her. He said she was trying to hit him, and he was scared. He said he hit the victim's head with his head a number of times, but he did not know how many times, and they were both bleeding. He said the gun first discharged early in the struggle, and the bullet grazed his right hand. He said he finally managed to get the gun from the victim, and he placed it on the counter. The defendant testified that the victim then apologized to him, hugged him and said, "I love you. We can work this out." He said once he relaxed his grasp on her, the victim ran to get the gun, and another struggle for the gun ensued. He said they were struggling in front of the couch when she fell downward toward the couch, and the gun discharged a second time, hitting her under the left eye.

The defendant testified that he did not know whether Josh Peyton was in the room when the gun was fired, but he vaguely remembered stumbling down the hallway afterward to look for a pen to write a note. He said he saw Josh while he was in the hallway. He said he did not remember writing a note or picking up his briefcase and gun, but he did recall trying to leave through the front door. He said because the front door was jammed, he went to the sliding glass door, removed the rod from the track, and left. He said Josh asked to go with him, but he sent Josh back inside the apartment.

12

The defendant testified that he was in an alcohol and panic-induced state of shock. He said he got into his car and drove, eventually ending up in Florida. He said he neither knew nor cared where he was going, and he had only forty or sixty dollars when he left his home to go to the victim's apartment and had no credit cards, change of clothing, or toiletry items with him. He said while he was in Florida, he sent a letter to Les Rawding asking Rawding to tell the police they could find the defendant's body somewhere in the Atlantic Ocean. He said that although he contemplated suicide, he could not do it. He said he was arrested several days later after he stole a car and a woman's purse and tried to use the stolen credit card to purchase luggage and men's clothing.

Les Rawding, the defendant's friend for thirteen years, testified that he met the defendant at a bar on the evening of August 19, 1989, at about 9:00 p.m. He said he drank with him for about an hour, and the defendant did not appear to be intoxicated. He said he did not see the defendant ingest cocaine that night, and he never saw the defendant become irrational or violent when he used the drug. He said he did not talk to the defendant again until the next morning when the defendant called him and told him he had killed the victim. He said the defendant told him he left a note saying he did it, and the defendant said he was leaving. Rawding said he did not know whether the defendant owned a gun, and he denied giving the defendant the gun used to shoot the victim.

Sherry Neal, an ex-girlfriend of the defendant, testified that she was in the defendant's home in the summer of 1988, and she knew the defendant owned two guns. She said she saw the guns on top of his bed one day. She said the defendant told her he carried a gun with him at all times.

Lilly Rose, the owner of First Class Escort Service in Nashville, testified that she knew the defendant for two years, and she was familiar with his telephone number and his voice because he had called her hundreds of times. She said she saw the defendant at Patrick's on August 19, 1989, and he appeared to be a little intoxicated. She said she saw the defendant being escorted from the bar but did not talk to him again until she received a call from him at about 3:00 a.m. She said he wanted her to send someone from her escort agency to his house, but she told him they were closed. She said the defendant had no difficulty speaking, and he made sense and sounded normal.

## I. DOUBLE JEOPARDY

The defendant contends that Ashe v. Swenson, 397 U.S. 436, 443-44, 90 S. Ct. 1189, 1194 (1970), precludes a second trial for first degree murder unless this court concludes that evidence in the first trial is sufficient to support a finding that the defendant formed premeditation and deliberation after he entered the victim's apartment. We conclude that the evidence is sufficient to support such a finding.

In Ashe, the United States Supreme Court explained the process a court must go through to determine whether collateral estoppel is applicable in the context of double jeopardy:

> Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."

Id. (citations omitted). See also State v. Allen, 752 S.W.2d 515, 516 (Tenn. Crim. App. 1988); State v. Moore, 713 S.W.2d 670, 674 (Tenn. Crim. App. 1985).

14

The defendant argues that because he was acquitted of burglary with the intent to commit murder yet convicted of first degree murder at the first trial, the jury necessarily must have found that the defendant did not intend to kill the victim when he broke into her apartment. Instead, he argues that the jury must have found that he formed the intent to kill after he entered the apartment. He contends that the jury must have found that the intent was formed during the struggle between him and the victim and that there was not enough time thereafter for the defendant to form the deliberation and premeditation necessary for first degree murder. He argues that because there was insufficient evidence presented at the first trial of premeditation and deliberation, the state should have been precluded from trying him for first degree murder. The trial court did not prohibit the state from proceeding on a first degree murder charge but did prohibit the state from proceeding on a theory that the defendant formed his intent to murder the victim before or while he was breaking into her apartment.

We conclude that there is ample evidence in the first trial from which the jury could have found premeditation and deliberation. The victim's neighbor, who lived upstairs, testified that she heard sounds of a struggle, then the sounds stopped for two minutes before she heard a gunshot. Also, the state presented a note, written by the defendant, in which he said he was going to kill the victim. The jury could easily have found beyond a reasonable doubt that during this two minute interval, the defendant formed the premeditation and deliberation necessary to support a first degree murder conviction. Finally, the testimony of the medical examiner, explaining the many injuries the victim sustained before she was shot, belies the defendant's claim that the shooting occurred during a mutual struggle. The medical examiner testified that after the victim received the beating, she could have been unconscious, or conscious yet very weak. Either way, she would be in no position to engage in violent combat with the defendant, as he claimed. This evidence is sufficient for the jury to have found beyond a reasonable doubt in the first trial that the defendant formed the necessary premeditation

15

and deliberation after he entered the victim's apartment. Thus, the collateral estoppel doctrine of the Double Jeopardy Clause did not preclude the state from retrying the defendant for first degree murder.

## II. SUFFICIENCY OF THE EVIDENCE

The defendant contends the evidence is insufficient to support his conviction for first degree murder. Specifically, the defendant argues that the evidence only supports a second degree murder or voluntary manslaughter conviction because the evidence shows the defendant and the victim were involved in mutual combat when the shooting occurred, and thus, there is no evidence of the elements of premeditation and deliberation. The state argues that the evidence is sufficient to support a finding of intent, premeditation, and deliberation.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

In the light most favorable to the state, we conclude that the evidence is sufficient to support the defendant's conviction for first degree murder. According to T.C.A. § 39-13-201(b), a deliberate act is one that is "performed with a cool purpose," whereas a premeditated act is one that is "done after the exercise of reflection and judgment." We believe there is ample evidence in the record to support the jury's

finding of premeditation and deliberation. The state introduced evidence from the victim's neighbor, who lived upstairs, that the sounds of the struggle between the defendant and the victim stopped, and two minutes later the neighbor heard the gunshot. The defendant argues that even if this witness' testimony is believed, two minutes is not enough time to deliberate and premeditate. However, neither this court nor our supreme court has delineated a specific time period during which deliberation must occur, other than that it cannot occur in an instant. See State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). With respect to premeditation, our supreme court has determined that it can be formed in an instant. See State v. West, 844 S.W.2d 144, 148 (Tenn. 1992). In addition, this court has concluded that both premeditation and deliberation can be formed in as few as one or two minutes. See State v. David L. Hassell, No. 02-C-01-9202-CR-00038, Shelby County, slip op. at 4-9 (Tenn. Crim. App. Dec. 30, 1992).

In addition to the two-minute time frame during which the state's witness testified that the struggle ended and the shot was fired, other evidence introduced at trial supports a finding that the defendant had time to premeditate and deliberate. Most damaging to the defendant with respect to premeditation and deliberation is the fact that he wrote a note stating that he was going to kill the victim. Although the defendant testified that he wrote the note after the shooting, merely confusing his tenses, the jury rejected his testimony in favor of the state's theory. The jury could have concluded that the defendant wrote the note during the two-minute interval, thereby having enough time to premeditate and deliberate. Furthermore, the testimony of Dr. Harlan, showing the victim was in no condition to engage in a violent struggle with the defendant before she was shot, belies the defendant's claim the shooting occurred during a mutual struggle. We conclude evidence of the defendant's intent, premeditation, and deliberation is sufficient to support his conviction for first degree murder.

17

### III. PRIOR BAD ACT

The defendant contends the trial court erred by admitting into evidence testimony from the victim's friend, Donna Beavers, that about a month before the shooting, the victim told Beavers the defendant held a gun to the victim's head.[1]  He argues the testimony should have been excluded under Rule 404(b), Tenn. R. Evid., it violated his right to a fair trial, and it violated his confrontation clause rights.

### A.

First, the defendant argues the testimony is inadmissible under Rule 404(b), Tenn. R. Evid.  Our standard of review on appeal with respect to the admission of evidence under Rule 404(b) is whether the trial court abused its discretion.  See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).[2]  The defendant correctly argues that in a criminal trial, evidence of another crime committed by a defendant usually is not admissible because it is irrelevant and prejudicial.  See State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994).  However, such evidence may be admissible under Rule 404(b) if it is relevant to a litigated issue, such as identity, intent, or rebuttal of accident or mistake, and its probative value is not outweighed by the danger of unfair prejudice.

We conclude that under the facts of this case, the trial court did not abuse its discretion in admitting Beavers' testimony that the defendant held a gun to the victim's head.  Our supreme court has recognized that evidence of a defendant's prior acts of violence against a victim is admissible under Rule 404(b) because the acts are relevant to show the defendant's hostility toward the victim, malice, intent, and a settled

---

[1] The trial court determined the statement was admissible as an excited utterance hearsay exception. See Tenn. R. Evid. 803(2).  The defendant does not challenge this determination.

[2] We note that the deference given to the trial court under the abuse of discretion standard is conditioned upon the trial court's substantial compliance with the procedural requirements of Rule 404(b).  Id.  The defendant concedes that the trial court followed the proper procedure for admitting evidence under Rule 404(b).

purpose to harm the victim. State v. Hall, 958 S.W.2d 679, 708 (Tenn. 1997), cert. denied, 118 S. Ct. 238 (1998); State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993). Our supreme court concluded that the probative value of such evidence is not outweighed by the danger of unfair prejudice. See Hall, 958 S.W.2d at 708. In the present case, the trial court admitted the evidence of the defendant's prior act against the victim in order to show the full relationship between the parties, to show the defendant's hostility toward the victim, and to show the defendant's malice, intent, and settled purpose to harm the victim. The trial court also determined that the probative value of the evidence is not outweighed by the danger of unfair prejudice. We conclude that the trial court did not abuse its discretion in admitting such evidence. Although the defendant complains that the evidence adds nothing probative to the state's case, the trial court correctly determined that the evidence is probative of the defendant's malice toward the victim and his intent to do harm to her. Furthermore, its probative value is not outweighed by the danger of unfair prejudice, particularly in light of the fact that the defendant admitted to a volatile relationship with the victim.

The defendant also contends that there was not clear and convincing evidence that the defendant held a gun to the victim's head. In order for evidence of a prior crime or wrong to be admissible under Rule 404(b), the trial court must find clear and convincing evidence of the other crime. See Tenn. R. Evid. 404(b), Advisory Commission Comment; Hall, 958 S.W.2d at 708; State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985). In the present case, the trial court heard testimony from Beavers that the victim told her the defendant held a gun to her head. Beavers testified that the victim related the incident to her immediately after it occurred, and the victim seemed excited. The defendant presented no evidence that either the victim had a motive to lie when she made the statement to Beavers or that Beavers had a motive to lie when she made the statement in court. We conclude this issue is without merit.

**B.**

Next, the defendant argues that the admission of Beavers' testimony denied him due process and his right to a fair trial. The defendant asserts that the test for whether the admission of evidence violated the defendant's federal constitutional rights to a fair trial is similar to the balancing test required for the admission of evidence under Rule 403, Tenn. R. Evid. Because we have already determined that the trial court did not abuse its discretion by finding the probative value of the evidence is not outweighed by unfair prejudice, we conclude that this issue is without merit.

**C.**

Finally, the defendant argues that the admission of Beavers' testimony violated the defendant's right to confront and cross-examine the victim. We disagree. The United States Supreme Court has held that in order to satisfy the confrontation clause, the state must show the declarant is unavailable, and the evidence must bear its own "indicia of reliability." Ohio v. Roberts, 448 U.S. 56, 66, 100 S. Ct. 2531, 2539 (1980). Evidence that falls within a firmly rooted hearsay exception is considered inherently reliable. Id.

The trial court admitted Beavers' testimony as an excited utterance hearsay exception. See Rule 803(2), Tenn. R. Evid. Both the United States Supreme Court and the Tennessee Supreme Court have determined that the excited utterance exception is firmly rooted. See White v. Illinois, 502 U.S. 346, 355 n.8, 112 S. Ct. 736, 742 n.8 (1992); State v. Taylor, 771 S.W.2d 387, 393-94 (Tenn. 1989). However, the defendant argues that the Tennessee Supreme Court also requires a finding that the evidence is not crucial or devastating. See State v. Henderson, 554 S.W.2d 117, 119 (Tenn. 1997); State v. Armes, 607 S.W.2d 234, 239 (Tenn. 1980). This court has previously determined that the "crucial or devastating" requirement is inapplicable when the right to confrontation has been satisfied. See State v. Arnold, 719 S.W.2d 543, 548

20

(Tenn. Crim. App. 1986). Even if the requirement were applicable, it would be satisfied in this case in light of the fact that the defendant had already admitted to a tumultuous and violent relationship with the victim, and there was other evidence presented from which the jury could find the defendant guilty of first degree murder.

## IV. PRIOR THREAT

The defendant argues that the testimony of the defendant's former girlfriend, Sherry Neal, regarding the defendant threatening her, constitutes prejudicial error. During the rebuttal phase of the trial, Neal testified that the defendant told her he carried a gun at all times. When the prosecutor asked Neal when the defendant made this statement, Neal responded, "On one occasion when he called and threatened to kill me." Both the prosecutor and the defense attorney immediately approached the bench, and the prosecutor told the trial court Neal had been instructed not to say anything about her past problems with the defendant. The trial court responded by telling the jury to disregard Neal's statement, instructing that the statement "has nothing to do with this lawsuit and don't consider it for any reason whatsoever, don't consider that in reaching a decision in this case."

The defendant acknowledges the well-established principle that a prompt curative instruction from the trial court generally cures any error. See State v. Tyler, 598 S.W.2d 798, 802 (Tenn. Crim. App. 1980). However, he argues that in this case, the trial court's instruction was ineffectual because the testimony was so prejudicial, it is more probable than not that the testimony affected the judgment. See T.R.A.P. 36(b). We disagree. Although Neal's testimony was inadmissible, the trial court gave a prompt curative instruction to the jury, and the jury is presumed to follow the trial court's instruction. See State v. Brothers, 828 S.W.2d 414, 416 (Tenn. Crim. App. 1991). We do not believe Neal's testimony more probably than not affected the judgment in light of the fact that other substantial evidence was presented against the defendant.

21

## V. REBUTTAL TESTIMONY

The defendant contends that the testimony of Lilly Rose, owner of First Class Escort Services, exceeded the proper scope of rebuttal and inflamed the jury. Specifically, the defendant takes issue with Rose's testimony that the defendant called her hundreds of times to secure the services of an escort. The defendant argues that because he freely admitted to using Rose's services, her testimony served no purpose on rebuttal. The state argues the testimony is proper because it contradicted several statements made by the defendant on direct examination.

Any competent evidence that explains, directly replies to, or contradicts material evidence introduced by the defense or brought out on cross-examination is admissible as rebuttal evidence. See State v. Smith, 735 S.W.2d 831, 835 (Tenn. Crim. App. 1987). The scope of rebuttal lies within the sound discretion of the trial court. Id. The trial court's decision on the admissibility of rebuttal evidence will not be overturned absent a clear abuse of discretion. See State v. Scott, 735 S.W.2d 825, 828 (Tenn. Crim. App. 1987).

Viewed in this light, we conclude that the trial court did not abuse its discretion by allowing Rose's testimony. Her testimony rebuts the defendant's claim that he was heavily intoxicated the morning of the shooting because she testified that she talked to him that morning, and he sounded fine. The fact that she had talked to him hundreds of times before is relevant to her being able to explain that she was familiar with his voice and knew he sounded normal when he called her before the shooting. In addition, her testimony directly contradicts the defendant's testimony in that Rose said the defendant called her at about 3:00 a.m. before the shooting, whereas the defendant said he did not leave a bar to return home until after 3:00 a.m. Even if the evidence did exceed the scope of rebuttal, its admission is harmless in light of the fact that the defendant had already testified that he consorted with prostitutes.

22

## VI. FINAL ARGUMENT

The defendant contends that the state made false statements during closing argument that constitute prejudicial error. First, the defendant argues that the state misstated the evidence when the prosecutor said the victim's head and neck could not have been more than one inch away from the couch when she was shot. Second, the defendant takes issue with the state's comment during closing argument that deliberation can occur within a period of only a few seconds. The state argues that the prosecutor correctly stated the law and did not misstate the evidence. The state also argues that any potential prejudice to the defendant was corrected when the trial court gave a curative instruction.

With respect to the defendant's contention that the prosecutor misstated the evidence, we note that the defendant failed to object to this statement during closing argument. The failure to object contemporaneously constitutes a waiver of the issue pursuant to Rule 36(a), T.R.A.P. Regardless, the prosecutor's statement is not so misleading that it was prejudicial error. The prosecutor said Dr. Harlan testified that the victim's neck could not have been more than one inch from the couch when she was shot, when in fact Dr. Harlan said the victim's neck could not have been more than a few inches from the couch. This discrepancy did not prejudice the defendant.

With respect to the defendant's contention regarding the prosecutor's comment on deliberation during closing argument, we hesitate to hold that the prosecutor misstated the law. After explaining that a deliberate act is one that is performed with a cool purpose after some period of reflection, the prosecutor stated, "The law doesn't make any specific amount of time for a period of time for reflection, it could be a few seconds when a person decides to go." The defendant objected, and a jury-out hearing was conducted. The trial court overruled the defendant's objection, but it did instruct the jurors that they were to follow the trial court's explanation of the law,

23

not the attorneys' explanations. The prosecutor then continued with closing argument, stating, "The law doesn't give any specific period. It can be after only a few seconds."

The prosecutor's statement of the law was not necessarily inaccurate. The prosecutor correctly stated that the law does not give any specific period of time during which deliberation must occur. Rather, the case law on deliberation instructs that it cannot occur in an instant. See Brown, 836 S.W.2d at 543. A linguistic analysis of whether a few seconds is synonymous with an instant is unnecessary in this case because the trial court gave an immediate curative instruction. In addition, there is no evidence that the prosecutor deliberately tried to mislead the jury, and there is ample evidence that would support the jury's finding of premeditation and deliberation, specifically the two-minute time period before the victim was shot and the defendant's own note, stating he was going to kill the victim. See Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). Based on these facts, we conclude that the prosecutor did not give an erroneous statement of the law, but even if she had given an erroneous statement, the defendant was not prejudiced.

## VII. REQUEST FOR SPECIAL INSTRUCTIONS

The defendant argues that the trial court gave erroneous jury instructions and erred by denying his request for special jury instructions. The state contends that the trial court's instructions were correct. Initially, we note that in criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies the defendant his constitutional right to a trial by jury. See State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1997). However, a special instruction need not be given when its substance is already covered in the general charge. See Edwards v. State, 540 S.W.2d 641, 649 (Tenn. 1976). We conclude that

24

the trial court properly instructed the jury and did not err by denying the defendant's special requests.

## A. PREMEDITATION AND DELIBERATION

After explaining to the jury that the state must prove the elements of deliberation and premeditation, the trial court stated:

> A premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexists in the mind of the accused for any definite period of time. It is sufficient that premeditation precede the act as long as it was the result of reflection and judgment.
>
> The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. If the design to kill was formed with premeditation and deliberation, it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect. Furthermore, premeditation can be formed if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided. A deliberate act is one performed with a cool purpose and after some period of reflection. Passion is any of the emotions of the mind reflecting anger, rage, or sudden resentment rendering the mind incapable of cool reflection.

The trial court later reiterated that the state must prove both premeditation and deliberation.

With respect to premeditation and deliberation, the defendant requested the following instruction:

> In order to convict the Defendant for premeditated murder, you must find that the Defendant formed the intent to kill prior to the killing, that is, premeditation, and that the Defendant killed with coolness and reflection, that is, deliberation. The deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait -- the cool purpose must be formed and the deliberate intention conceived in the mind, in the absence of passion, to take the life of the person slain.

Deliberation requires some period of reflection, during which the mind is free from the influences of excitement or passion. Passion and anger mean the same thing in criminal law.

After reviewing the trial court's instruction and the defendant's requested instruction, we conclude that the trial court properly instructed the jury and did not err by denying the defendant's special request. First, we note that the defendant requested the trial court to instruct the jury that the premeditation and deliberation must be akin to that manifested when the killing is by poison or lying in wait. The defendant correctly argues that our supreme court in Brown stated that the deliberation and premeditation must be akin to the deliberation and premeditation manifested when the murder is by poison or lying in wait. However, the court continued by stating, "Murder by poison or lying in wait, are given as instances of this sort of deliberate and premeditated killing, and in such cases no other evidence of the deliberation and premeditation is required; but where the murder is by other means, proof of deliberation and premeditation is required." Brown, 836 S.W.2d at 539-40 (emphasis added). Thus, the Brown decision does not require a finding that the premeditation and deliberation be the same as that formed when murder is by poison or lying in wait as the defendant suggests, rather if the premeditation and deliberation are of such a type, no other evidence of premeditation or deliberation need be shown. See also State v. Hurley, 876 S.W.2d 57, 71 (Tenn. 1993) (the state must prove that killing was by poisoning or lying in wait or with premeditation and deliberation) (citations omitted). Thus, the trial court did not err by refusing the defendant's special request.

The defendant also argues that the trial court did not adequately address the length of time necessary for the exercise of reflection and judgment. Although under the first degree murder statute in effect at the time of the offense in this case, reflection and judgment relate to premeditation, the defendant argues that the trial court

26

did not properly instruct the jury in this regard with respect to deliberation. In either event, the trial court's instruction was proper.

Our supreme court has held that premeditation can be formed in an instant, see West, 844 S.W.2d at 148 (Tenn. 1992), although it has also held that it is not wise to instruct a jury of that fact because of the risk of confusing premeditation with deliberation, which cannot be formed in an instant. See Brown, 836 S.W.2d at 543. The trial court did not instruct the jury that premeditation can be formed in an instant. Instead, the trial court told the jury that a premeditated act is one that is done after the exercise of reflection and judgment. The trial court's instruction was correct.

Deliberation differs from premeditation in that it requires proof that the homicide was committed with a cool purpose and without passion or provocation. Brown, 836 S.W.2d at 543. The trial court instructed the jury that a deliberate act is one performed with a cool purpose and after some period of reflection when the mind is free from passion or provocation. In light of the fact that neither this court nor our supreme court has delineated a specific period of time during which deliberation must occur, other than the fact that it cannot be formed in an instant, we conclude that the trial court's instruction with respect to deliberation was correct. In addition, the trial court's definition of deliberation is nearly identical to the special instruction the defendant requested.

## B. VOLUNTARY MANSLAUGHTER

Next, the defendant argues that the jury instructions do not adequately address the degree of provocation necessary to lower an intentional killing from first or second degree murder to voluntary manslaughter. We disagree. The trial court instructed the jury that a conviction for first degree murder requires a finding that the defendant was free from passion and excitement. The trial court also instructed the jury

27

that voluntary manslaughter requires a finding that "[i]f the intention and the act are the result of impulse and passion, the idea of malice is negated. Killing upon a sudden heat of passion without malice distinguishes voluntary manslaughter from murder in the second degree." The trial court adequately instructed the jury regarding the degree of provocation necessary for premeditated murder and voluntary manslaughter.

The defendant argues that the trial court gave an erroneous instruction of the law when it told jurors that they must determine whether the defendant was sufficiently free from excitement and passion to be capable of premeditation. The defendant argues that this instruction is contrary to prior case law indicating that the heat of passion brought on by adequate provocation need not be so great as to deprive the defendant of all reason, thus rendering the defendant incapable of premeditation or deliberation. See Seals v. State, 62 Tenn. 459, 463 (1874), and Haile v. State, 31 Tenn. 248, 252 (1851). This issue is without merit. The trial court's definition of voluntary manslaughter restates that given in Brown, 836 S.W.2d at 553. Furthermore, the trial court did not instruct the jury that the defendant must be completely free from excitement and passion, but rather that the defendant must be sufficiently free from excitement or passion. This instruction is consistent with the essence of what the defendant requested, it is a more accurate statement of the current law, and it is less confusing than the instruction proposed by the defendant.

## C. SECOND DEGREE MURDER

Finally, the defendant argues that the trial court did not provide a sufficient instruction relative to second degree murder. He contends that the trial court's instructions do not explain the law applicable to a killing done in anger or passion that is insufficient to reduce the killing to voluntary manslaughter. We conclude that this issue is also without merit. After explaining the elements of second degree murder, the trial court instructed the jury, "If one person upon a sudden impulse of passion without

28

adequate provocation and disconnected with any previously formed design to kill, kills another willfully and maliciously, such killing is unlawful and is murder in the second degree." The trial court went on to distinguish second degree murder from voluntary manslaughter stating, "Killing upon a sudden heat of passion without malice distinguishes voluntary manslaughter from murder in the second degree." Essentially, the defendant argues that the trial court should have instructed the jury that if the intent to kill is formed in passion and executed without time for the passion to cool, it is murder in the second degree. The trial court may not have used the exact wording the defendant requested, but the substance of the trial court's instruction encompasses the defendant's request. We conclude the trial court did not err by denying the defendant's special requests.

## VIII. SEQUENTIAL INSTRUCTION

Next, the defendant argues that the trial court erred by instructing the jury to consider lesser included offenses only after unanimously determining that the defendant was not guilty of the greater offense. This court has twice rejected this argument. In State v. Rutherford, 876 S.W.2d 118, 119-20 (Tenn. Crim. App. 1993), this court determined that a sequential jury charge did not prevent the jury from fulfilling its duty to determine the degree of homicide. This court reached the same conclusion in State v. Raines, 882 S.W.2d 376, 381-82 (Tenn. Crim. App. 1994). We view these cases to be controlling.

## IX. UNFAIR TRIAL

The defendant asks this court to conclude that the cumulative effect of all the alleged errors resulted in the defendant being deprived of a fair trial. See State v. Cadle, 634 S.W.2d 623, 626 (Tenn. Crim. App. 1982). In considering our rulings as to the above issues, we conclude there are no errors that cumulatively would rise to the

29

level that would deprive the defendant of a fair trial. See Rosenthal v. State, 292 S.W.2d 1, 4-5 (Tenn. 1956).

## X. SENTENCING

The defendant contends that the trial court erred by ordering him to serve his sentence consecutive to a previous conviction for the sale of cocaine. Specifically, he argues that the trial court gave no basis for finding the defendant to be a dangerous offender, see T.C.A. § 40-35-115(b)(4), nor did the trial court find confinement is necessary to protect the public from further criminal conduct by the defendant. See State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). The state argues that the record supports a finding that the defendant is a dangerous offender, and in the alternative, that a consecutive sentence is proper considering the defendant's history of criminal activity. See T.C.A. § 40-35-115(b)(2).

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section notes, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."

30

State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of

meaningful appellate review,

> the trial court must place on the record its reasons for arriving
> at the final sentencing decision, identify the mitigating and
> enhancement factors found, state the specific facts supporting
> each enhancement factor found, and articulate how the
> mitigating and enhancement factors have been evaluated and
> balanced in determining the sentence. T.C.A. § 40-35-210(f)
> (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1995).

Also, in conducting a de novo review, we must consider (1) the evidence,

if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the

principles of sentencing and arguments as to sentencing alternatives, (4) the nature

and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement

factors, (6) any statement that the defendant made on his own behalf and (7) the

potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see

Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The trial court's only finding with respect to consecutive sentencing was

when the trial judge stated "the facts . . . are sufficient to convince me that [the

defendant] is a dangerous offender . . . ." This court has previously determined that a

trial court must provide "a principled justification for every sentence, including, of

course, consecutive sentences." Wilkerson, 933 S.W.2d at 939 (citations omitted).

Based on the record before us, the trial court did not consider all relevant sentencing

principles. Thus, our review of sentencing is de novo on the record with no

presumption of correctness. See Ashby, 832 S.W.2d at 169.

Nevertheless, we conclude that the record supports a consecutive

sentence. There is no question but that the defendant's behavior indicated little or no

regard for human life and that he had no hesitation about committing a crime in which

31

the risk to human life was high.  See T.C.A. § 40-35-115(b)(4).  In addition, the sentence is necessary to protect the public against further criminal conduct by the defendant and the consecutive sentence reasonably relates to the severity of the offense committed.  See Wilkerson, 905 S.W.2d at 939.  The evidence shows that the defendant viciously beat the victim before shooting her in the face while the victim's two small children were in the apartment.   In addition to brutally beating then murdering the victim, the defendant admitted a long history of buying, selling and using cocaine.  He admitted driving while under the influence of alcohol and drugs.  He admitted at least two assaults.  In light of these facts, we determine that a consecutive sentence is appropriate.

## XI. EQUAL PROTECTION

Finally, the defendant argues that in first degree murder cases when the state is not seeking the death penalty, the automatic imposition of a life sentence that follows a conviction violates the equal protection component of the Law of the Land clause of Article I, Section 8 of the Tennessee Constitution.  Specifically, the defendant argues that because not all first degree murders share equal moral culpability, the sentencing judge should be given discretion as to whether to impose life imprisonment following a conviction for first degree murder.  This court has previously held that under a rational basis test, the automatic imposition of a life sentence under T.C.A. § 39-13-202(b) does not violate Article I, Section 8 of the Tennessee Constitution.  See State v. Ray, 880 S.W.2d 700, 706 (Tenn. Crim. App. 1993).  We decline the defendant's invitation in the present case to reverse this court's prior determination.

32

## V. CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
Gary R. Wade, Presiding Judge

_____
William M. Barker, Special Judge